INFANT C.

V.

BOY SCOUTS OF AMERICA, INC., ET AL.

Record No. 890906

April 20, 1990

Present: All the Justices

Douglas B. Wessel *(William A. Barton; Barton & Strever,* on briefs), for appellant.

*Barry Bach; Mark J. Yeager (Roger E. Cadigan; Catherine A. Potthast; Peter D. Greenspun; Smith, Somerville & Case; Klein & Greenspun,* on briefs), for appellees.

JUSTICE RUSSELL delivered the opinion of the Court.

This appeal presents questions concerning agency relationships between national and local branches of the Boy Scout program. It also involves the question whether the proof presented at trial conformed to pleadings which alleged willful and wanton misconduct.

Infant C., by his parents and next friends, brought this action against Boy Scouts of America, a corporation chartered by an Act of Congress (BSA), National Capital Area Council, Boy Scouts of America, a District of Columbia corporation (NCAC), and Carlton L. Bittenbender. Infant C. alleged that, at the age of 12, in January 1984, he had become a member of Boy Scout Troop 1970 in Reston, Virginia. Bittenbender was the troop's scoutmaster. Infant C. further alleged that Bittenbender had initiated a homosexual relationship with him and had homosexually molested him on 60 or more occasions over a period of a year, persuading him that such behavior was normal and acceptable. This, he alleged, caused severe psychological, emotional, and physical harm, resulting in his withdrawal from school and commitment to in-patient treatment in a psychiatric hospital in 1985. Those allegations are substantially uncontested.

The motion for judgment also alleged that Bittenbender had a long history of pederasty which BSA and NCAC should have known, because Bittenbender had been convicted in 1981, upon a

plea of *nolo contendere*, of four counts of sexual assault against a boy scout in Rhode Island while acting as a scoutmaster there. The plaintiff contended that BSA and NCAC were negligent in the selection and retention of Bittenbender as a scoutmaster.

The case went to a jury trial that lasted nearly six weeks. At the close of the evidence, all defendants moved to strike all counts of the motion for judgment. The court granted the motion in part, striking all counts against BSA and NCAC except Count III, which alleged ordinary negligence in the selection and retention of the scoutmaster. The court granted the motion to strike all counts against Bittenbender on the ground that those counts sounded in negligence, while the proof adduced at trial was that Bittenbender was guilty of intentional torts, not negligence. The plaintiff moved for leave to amend his pleadings to conform to the proof, but the court denied the motion as untimely.

Accordingly, Bittenbender was dismissed from the case and the jury considered only the ordinary negligence claims against BSA and NCAC. After deliberating seven days, the jury returned a verdict exonerating BSA and awarding the plaintiff $45,000 in damages against NCAC. The court entered judgment on the verdict.

Bittenbender had been convicted of a number of felonies as a result of his homosexual offenses against Infant C. and two other boy scouts in Troop 1970 and was serving a long penitentiary sentence during the trial of the present case. He was represented below, and is represented here on appeal, by a guardian *ad litem* appointed by the court. The court awarded his guardian *ad litem* fees of $37,273.90, and ordered that those fees would constitute a lien upon the plaintiff's $45,000 judgment. The court also appointed a guardian *ad litem* to represent the infant plaintiff, and awarded an $18,285 fee to be paid directly to that guardian by NCAC.

We awarded Infant C. an appeal, limited to assignments of error which frame three questions: the correctness of the court's rulings (1) concerning the liability of BSA, (2) striking the counts against Bittenbender, and (3) assessing Bittenbender's guardian *ad litem* fees against the plaintiff.

## LIABILITY OF BSA

Because the jury found in BSA's favor, the facts will be summarized in the light most favorable to that defendant. BSA was

chartered by Congress in 1916 to deliver the scouting program to American youth through existing community organizations. BSA makes an annual report to Congress on the progress of the program. BSA issues charters to regional groups of volunteers who, in turn, incorporate in their own respective states, raise their own funds, hire their own staff, and promote the scouting movement in their respective regions. These regional groups are called councils. One such council is NCAC, chartered in the District of Columbia to promote scouting in that jurisdiction as well as in Northern Virginia and Southern Maryland.

The local councils offer the scouting program only through existing community organizations such as churches, schools, service clubs, and fraternal organizations. Community organizations wishing to offer some phase of the scouting program may apply to the local council for a charter. The chartered organization may then engage in such phases of the scouting program as the organization sees fit.

A chartered organization desiring to form a boy scout troop designates a group of volunteers, consisting of organization members and parents, as a troop committee. The troop committee is responsible for the operation of the troop, designates its program, selects its leaders, and provides its meeting place. It is the committee's responsibility to select the scoutmaster and assist him in providing a sound program for the troop.

When the troop committee has chosen a scoutmaster, it sends an "adult application" and registration fee to the local council, which notes it on the troop's roster and forwards the scoutmaster's application to BSA's headquarters in Irving, Texas. When the application is received there, the applicant's name is checked against a confidential list of persons previously reported to BSA as "unfit." If not so listed, and if the applicant meets other requirements, the application is approved and returned to the local council.

BSA is controlled by a National Council, which selects an Executive Board. Both are comprised of volunteers. The Board selects a paid executive who employs a staff of about 235 persons nationwide, known as "professional scouters."

The local councils are similarly composed. Their governing boards, consisting of volunteers, hire a paid executive who, in turn, employs a staff of professional scouters. There are approximately 409 local councils in the country, employing approximately 3,300 professional scouters. Nationally, there are 1.4 million to

1.7 million adult volunteers serving each year, with an annual turnover of about one-third. Approximately four million boys are involved in scouting each year.

BSA had no facilities for investigating allegations of "unfitness," but it did promulgate a procedure for maintaining "standards of leadership." This procedure required local councils to inform BSA of any information they discovered which reflected on the "fitness" of any volunteer. BSA's file contained many unproven allegations, and was therefore kept in confidence. Nevertheless, if an applicant was listed there, BSA would notify the local council that the volunteer was ineligible. A local troop committee could discharge a scoutmaster directly for misconduct, without any prior approval by BSA or the local council.

In 1980, Bittenbender had been a volunteer scoutmaster in Troop 3, in Barrington, Rhode Island, under the jurisdiction of the Narragansett Council. While there, he was accused of homosexual molestation of four boys in the troop. In 1981, he was convicted by a Rhode Island court of four counts of sexual assault on one of the scouts, after pleading *nolo contendere*, and was sentenced to five years imprisonment, suspended upon condition of mandatory psychiatric treatment during five years of probation. Bittenbender saw several therapists for his admitted pedophilia before coming to Virginia in late 1983. He stated that he thought the therapy had brought his pedophilia under control.

After Bittenbender's conviction in Rhode Island, the scouting executive employed by the Narragansett Council intended to inform BSA's headquarters of the matter, and thought that he had done so. The executive checked his files after Bittenbender's arrest in Virginia, however, and determined that he had inadvertently failed to notify BSA. It is undisputed that no adverse information concerning Bittenbender ever reached BSA's files until after Bittenbender's arrest in Virginia.

In January, 1984, Troop 1970 had been without a scoutmaster for several months. The troop committee asked NCAC for assistance, but it was unable to help. A minister told Bittenbender of the troop's vacancy, and Bittenbender applied to the troop committee, which selected him as a volunteer scoutmaster after two or three interviews. Neither BSA nor NCAC took any part in his selection. Bittenbender's pedophilia came to the attention of the troop committee in May 1985, when the father of another boy reported Bittenbender's relationship with his son to the committee.

The committee then, on its own accord, obtained Bittenbender's resignation. In July 1985, Infant C. first told his parents of his relationship with Bittenbender. The parents reported this to the Fairfax police and Bittenbender's criminal prosecution and conviction followed.

Although Bittenbender had begun acting as scoutmaster for Troop 1970 in January, 1984, and his molestation of Infant C. began at that time, Bittenbender's "adult application" to be a scoutmaster was not dated until September 13 of that year, and it was not received at BSA headquarters until November 14. The boy broke off the relationship in December. Thus, BSA did not approve the application until the relationship had nearly ended.

BSA and NCAC asserted the defense of charitable immunity. The plaintiff argued in the trial court and on appeal that the doctrine of charitable immunity should be abrogated, or at least modified in the circumstances of this case. The trial court, however, correctly noted that the plaintiff's allegations brought the case within a well-established exception to the doctrine: a charitable organization is liable to the beneficiaries of the charity for the negligence of its employees if it fails to exercise ordinary care in the selection and retention of those employees. *J . . . v. Victory Tabernacle Baptist Church*, 236 Va. 206, 208, 372 S.E.2d 391, 393 (1988); *Hill v. Memorial Hospital, Inc.*, 204 Va. 501, 507, 132 S.E.2d 411, 415 (1963); *Memorial Hospital v. Oakes, Adm'x.*, 200 Va. 878, 885, 108 S.E.2d 388, 393 (1959); *Norfolk Prot. Hospital v. Plunkett*, 162 Va. 151, 153, 173 S.E. 363, 363-64 (1934); *Weston's Adm'x. v. St. Vincent, etc.*, 131 Va. 587, 610, 107 S.E. 785, 792 (1921). The case was submitted to the jury pursuant to that exception. It is therefore unnecessary that we consider any modification of the doctrine of charitable immunity, even if we were inclined to do so, because that doctrine had no material impact on the present case.

At the plaintiff's request, the court instructed the jury that if BSA "and/or" NCAC "selected and/or retained Carlton Bittenbender as a Scoutmaster for Troop 1970," and if BSA "and/or" NCAC "were negligent in the selection and/or retention" of Bittenbender, then, if that negligence was a proximate cause of injury to the plaintiff, the jury must find for the plaintiff. Further, at the plaintiff's request, the court correctly instructed the jury on the principles of agency and told the jury that notice to an agent is legally imputed to its principal.

Under these instructions, counsel for the plaintiff was enabled to argue to the jury that the local councils were agents of BSA, that notice of Bittenbender's pedophilia, obtained by the Narragansett Council, was imputed to BSA, and that BSA's acquiescence in Bittenbender's appointment as scoutmaster to Troop 1970 was negligent.[1]

By agreement of counsel, eleven special interrogatories were submitted to the jury in lieu of a general verdict form. Interrogatory 3 asked the jury: "Did the Boy Scouts of America select and/or retain Carlton Bittenbender as a scoutmaster for Troop 1970?" The jury answered "No." Plaintiff's counsel made no objection to the form of the question.

■ The instructions given without objection, and the interrogatories propounded by the court, with counsel's agreement, have become the law of the case. *Bradner* v. *Mitchell*, 234 Va. 483, 491, 362 S.E.2d 718, 723 (1987); *Norfolk & Portsmouth Railroad* v. *Barker*, 221 Va. 924, 928, 275 S.E.2d 613, 615 (1981). Although the plaintiff suggests, on appeal, that the local councils should have been held to be BSA's agents as a matter of law, the plaintiff concurred in submitting the issue of agency to the jury. Indeed, the evidence on that issue was such as to lead reasonable persons to opposite conclusions, and was therefore proper for determination by a jury. There was abundant evidence to support the conclusion the jury ultimately reached. Accordingly, we will affirm the judgment in favor of BSA.[2]

## LIABILITY OF BITTENBENDER

The plaintiff's eight-count amended motion for judgment contained three counts against Bittenbender: Count IV, captioned "SCOUTMASTER'S recklessness and/or Conscious Disregard of BOY SCOUT'S Welfare," Count V, captioned "Gross Negligence of SCOUTMASTER," and Count VI, captioned "Negligence of SCOUTMASTER." As stated above, the court struck all three

---

[1] On appeal, the plaintiff contends that the trial court should have resolved the issue of agency as a matter of law. No error was assigned, however, to the court's submission of that issue to the jury. Accordingly, we do not reach that contention. Rule 5:17(c).

[2] We refused an appeal on the plaintiff's assignments of error with respect to the judgment against NCAC, therefore, that judgment is final. The jury made express findings that NCAC selected "and/or" retained Bittenbender as scoutmaster, that NCAC was negligent in that regard, and that NCAC's negligence was a proximate cause of the plaintiff's injuries.

counts and dismissed Bittenbender as a party on the grounds that the proof offered against Bittenbender showed that his conduct was intentional, that intentional torts cannot be proved under allegations of negligence, and that all three counts of the amended motion for judgment alleged only negligent conduct.

Count IV reads, in pertinent part:

(*SCOUTMASTER'S Recklessness and/or Conscious Disregard of BOY SCOUT'S Welfare*)

71. Plaintiff BOY SCOUT re-alleges and incorporates herein paragraphs 1 through 56 above.

72. At all relevant times SCOUTMASTER owed the duty to BOY SCOUT to use reasonable care under the circumstances for the health and safety of BOY SCOUT.

73. SCOUTMASTER was reckless, consciously disregarded BOY SCOUT's welfare and breached his duty of reasonable care under the circumstances for the health and safety of BOY SCOUT.

74. SCOUTMASTER breached his duty of reasonable care under the circumstances when he, among other acts and omissions:

[Eighteen subparagraphs follow, describing specific acts, including criminal conduct]

75. As a direct and proximate result of the Defendant's aforesaid recklessness and conscious disregard of BOY SCOUT's welfare, BOY SCOUT suffered and will continue to suffer the aforementioned damages.

In *Booth* v. *Robertson*, 236 Va. 269, 273, 374 S.E.2d 1, 3 (1988), we held that punitive damages are warranted not only by malicious conduct, but also by "*negligence* which is so willful or wanton as to evince a conscious disregard of the rights of others" (emphasis added). In *Booth*, we followed *Friedman* v. *Jordan*, 166 Va. 65, 184 S.E. 186 (1936), where we said, "Wilful or wanton *conduct* imports knowledge and consciousness that injury will result from the act done. The act done must be intended or it must involve a reckless disregard for the rights of another and will

probably result in an injury. Ill will is not a necessary element . . . ." *Id.* at 68, 184 S.E. at 187 (emphasis added).

The tort alleged under Count IV is given various labels by the authorities, e.g., "such recklessness or negligence as evinces a *conscious* disregard of the rights of others," *Baker* v. *Marcus*, 201 Va. 905, 909, 114 S.E.2d 617, 621 (1960) (quoting *Wood* v. *Amer. Nat. Bank*, 100 Va. 306, 316, 40 S.E. 931, 934 (1902)); "a spirit of mischief, criminal indifference, or conscious disregard of the rights of others," *Baker*, 201 Va. at 910, 114 S.E.2d at 621; "wilful or wanton conduct," *Thomas* v. *Snow*, 162 Va. 654, 660, 174 S.E. 837, 839 (1934) and *Friedman*, 166 Va. at 68, 184 S.E. at 187; "willful or wanton negligence," *Boward* v. *Leftwich*, 197 Va. 227, 230-31, 89 S.E.2d 32, 34-35 (1955); negligence which is "willful, wanton, and reckless," *Griffin* v. *Shively*, 227 Va. 317, 321, 315 S.E.2d 210, 212 (1984); "reckless disregard of the safety of another." Restatement (Second) of Torts § 500 (1965).

However they may be phrased, the foregoing labels all designate tortious conduct of a single species.

> In order that one may be held guilty of wilful or wanton conduct, it must be shown that he was conscious of his conduct, and conscious, from his knowledge of existing conditions, that injury would likely or probably result from his conduct, and that with reckless indifference to consequences he consciously and intentionally did some wrongful act or omitted some known duty which produced the injurious result.

*Thomas*, 162 Va. at 660, 174 S.E. at 839 (citation omitted).

> Willful and wanton negligence is acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another.

*Griffin*, 227 Va. at 321, 315 S.E.2d at 213, (citing *Friedman*, 166 Va. at 68, 184 S.E. at 187).

The hallmark of this species of tortious conduct is the defendant's consciousness of his act, his awareness of the dangers or probable consequences, and his reckless decision to proceed notwithstanding that awareness. Because such consciousness and awareness are prerequisites, the use of the term "negligence," in

defining the tort, is a misnomer, to the extent that negligence is equated with inadvertent neglect of a duty.

■ Gross negligence and ordinary negligence differ from one another only in degree, but the species of tortious conduct which the authorities have variously labelled willful and wanton conduct, or reckless misconduct, or willful and intentional conduct, differs in kind from both of them. *See Kennedy v. McElroy*, 195 Va. 1078, 1081, 81 S.E.2d 436, 439 (1954). "Negligence conveys the idea of heedlessness, inattention, inadvertence; willfulness and wantonness convey the idea of purpose or design, actual or constructive." *Boward*, 197 Va. at 231, 89 S.E.2d at 35, (quoting *Thomas*, 162 Va. at 660, 174 S.E. at 839).

■ Although the plaintiff's Count IV referred to Bittenbender's duty to "use reasonable care under the circumstances for the health and safety" of the plaintiff, it alleged that the duty was breached with reckless and conscious disregard of the plaintiff's health, safety, and welfare. Thus, although the allegations refer to a breach of duty, they do not charge that the breach was done with the "heedlessness, inattention, [or] inadvertence" which is the hallmark of negligence. Rather, they charge the recklessness and consciousness characteristic of willful and wanton conduct.

■ Bittenbender successfully moved to strike on the ground that the plaintiff's proof had established an intentional tort, never alleged in the pleadings. There is a substantial difference between willful and wanton conduct, on one hand, and intentional misconduct on the other. An actor guilty of intentional misconduct must intend to cause harm to another. *See, e.g., Johnson v. Insurance Co. of No. America*, 232 Va. 340, 350 S.E.2d 616 (1986) (actor understood nature and consequences of his conduct and had purpose and volition to cause injury). An actor guilty of willful and wanton conduct intends his act, but not the resulting harm. *See, e.g., Booth, supra* (drunken driver guilty of willful and wanton conduct even though lacking ill-will, malice, or intention to cause harm).

*Intentional misconduct and recklessness contrasted.* Reckless misconduct differs from intentional wrongdoing in a very important particular. While an act to be reckless must be intended by the actor, the actor does not intend to cause the harm which results from it. It is enough that he realizes or, from facts which he knows, should realize that there is a

strong probability that harm may result, even though he hopes or even expects that his conduct will prove harmless. However, a strong probability is a different thing from the substantial certainty without which he cannot be said to intend the harm in which his act results.

Restatement (Second) of Torts § 500 comment f (1965).

Some of our prior decisions have incorporated the term "intentional" into the description of willful and wanton conduct. For example, the Court stated in *Thomas* that gross negligence "falls short of being such reckless disregard of probable consequences as is equivalent to a wilful and *intentional* wrong." 162 Va. at 661, 174 S.E. at 839 (emphasis added). Similar expressions are found in *Wright* v. *Osborne*, 175 Va. 442, 445, 9 S.E.2d 452, 454 (1940), and *Thornhill* v. *Thornhill*, 172 Va. 553, 563, 2 S.E.2d 318, 322 (1939), and appear to derive from *Altman* v. *Aronson*, 231 Mass. 588, 121 N.E. 505 (1919), which we quoted with approval in *Thornhill, Wright*, and *Thomas.*

Each of those cases involved an action by a guest passenger against a host driver under the former guest statute and employed the term "intentional" as a contrast in defining gross negligence. To the extent the term "willful and intentional wrong" served to distinguish gross negligence from a tortious act intended by the actor, it was sufficiently precise. But the gross negligence cases did not require that any distinction be made between an intentional act done without intending harm, on one hand, and an intentional act done with intent to harm, on the other. Resolution of the issue presented by the present case requires articulation of the difference, and we now make that distinction in accordance with the comment to the Restatement, quoted above.

■■■ When the evidence in the present case is analyzed in light of the foregoing distinction, it falls short of showing any intention by Bittenbender to cause harm to Infant C. Instead, his motivation may be characterized, in the most unfavorable light, as deliberate self-gratification with a total disregard of the consequences to his victims. Called as an adverse witness by the plaintiff, Bittenbender sought to portray himself as a helpless victim of an illness he was unable to control. He stated that he would never have returned to scouting after his conviction in Rhode Island if he had not thought that his "problem" was under control. A psychiatrist who had examined him testified that he did not intend to harm his

victims, although he realized that the risk of harm to the many boys he molested was a matter of "Russian Roulette," in that he thought some boys might suffer harm from his acts and some would not.

We conclude that the plaintiff, in Count IV, alleged willful and wanton misconduct on Bittenbender's part, and that the proof at trial conformed to those allegations. Because the trial court erred in striking the evidence under that count, we will reverse the judgment in part and remand the case for further proceedings with respect to Count IV only, consistent with this opinion.

## GUARDIAN AD LITEM FEES

Reversal of the judgment in Bittenbender's favor will have no effect on the quantum of the fees awarded to his guardian *ad litem*, but renders moot the trial court's assessment of those fees against the plaintiff. The trial court may allocate those fees, and any additional fees incurred on remand, based upon the final result.

In all other respects, the judgment will be affirmed.

*Affirmed in part, reversed in part, and remanded.*