Present: All the Justices

KATINA GREEN,
ADMINISTRATOR OF THE ESTATE OF
CHRISTIE D. GREEN

v.  Record No. 040480     OPINION BY JUSTICE DONALD W. LEMONS
                                       March 3, 2005

GEORGE INGRAM, ET AL.


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Randall G. Johnson, Judge

Christie D. Green ("Green") was shot and killed by fragments from a frangible round shot at and through a door when police officers sought to gain entrance to a home to execute a search warrant.  Katina Green, the administrator of the estate ("administrator" or "plaintiff"), sued various defendants in a wrongful death action.  In this appeal, we consider whether the trial court erred in granting a motion to strike the administrator's evidence and dismissing her motion for judgment.

I.  Facts and Proceedings Below

A.  Background

According to well-settled principles of appellate review, when the trial court grants a motion to strike the plaintiff's evidence, we review the evidence on appeal in the light most favorable to the plaintiff.  Perdieu v. Blackstone Family Practice Ctr., Inc., 264 Va. 408, 411, 568 S.E.2d 703, 704

(2002); Bryan v. Burt, 254 Va. 28, 30-31, 486 S.E.2d 536, 537 (1997).

On December 29, 1998, Captain John B. Buckovich ("Buckovich") led the Richmond Special Weapons and Tactics ("SWAT") team on a mission at 1112-C Dove Street in the City of Richmond. The purpose of this mission was to serve a search warrant at a home where illegal drugs and firearms were located. Sergeant George J. Ingram ("Ingram"), a member of the SWAT team, was assigned the task of breaching the kitchen door using frangible breaching rounds.

As part of initiating the entry, police employed a technique known as "rake and break." The technique involves the breaking of a front window and announcing, "Richmond Police, search warrant," while entry through a door at a different location is accomplished.

While the "rake and break" was being employed at the front of the house, Ingram attempted to enter the residence through the kitchen door. The door was an exterior, heavy, windowless, composite wood door, with a lockless doorknob set below a single cylinder deadbolt lock mortised into the door. Prior to using the frangible rounds, Ingram attempted to open the door by turning the doorknob. While the doorknob turned freely, the door did not open and Ingram concluded that the deadbolt was engaged.

2

Ingram then used a shotgun to fire frangible rounds at the door's locking system. According to SWAT team training and Ingram's own testimony, the optimal angle from which to shoot a frangible round is a downward 45-degree angle. The purpose of this angle is to push any possible debris downward to prevent injuries. The exact angle used by Ingram is not known, but evidence at trial indicated that Ingram did fire at a downward angle. The frangible rounds fired by Ingram are designed to disintegrate into powder upon impact with metal. In attempting to breach the kitchen door, Ingram fired five frangible rounds.

Ingram stated that his first shot "[p]enetrated the door right where the throw was, about the location of the throw, or where the throw is. You can't see the throw obviously when the door is locked, but approximately where the throw is." In discussing the second shot, Ingram stated that he pointed the barrel of his shotgun below the hole created by the first shot. When asked why he aimed below his first shot, Ingram stated that the door had not swung open on the first shot and "how you work this is you shoot, you look, you shoot, you look, working in a pattern to clear it where the throw would be." Ingram was next asked about the angle of each of the shots and he replied that the angle would become steeper as he went down from the first shot to the last shot, such that the

first shot was the least steep angle and the last shot was the most steep angle.

After each shot, Ingram testified that he made a "visual and toe check," consisting of a visual inspection of the results of the shot and an attempt to push the door open with his foot. He stated that "sometimes it takes two and sometimes it takes five shots" and that the purpose of the toe check is to determine between shots whether the door will open. Ingram testified that he performed this check after each of his five shots.

Ingram testified that his first shot was between the deadbolt lock and the frame of the door, and that his four subsequent shots were each an inch successively lower in a vertical line. At no point during the firing of the frangible rounds did Ingram re-attempt to open the door by turning the doorknob below the deadbolt.

After firing five frangible rounds, Ingram still could not open the door by pushing it with his foot. A battering ram was used to open the door and enter the residence. Upon entry, the SWAT team found Green lying dead on the kitchen floor, her body draped over her three-year-old daughter, who was unharmed. As a visitor to the home, she had arrived approximately twenty minutes before the SWAT team began the breaching operation.

4

An autopsy revealed that frangible round fragments caused Green's death.  After entering the residence, police found heroin, an assault rifle and high-volume ammunition magazines, two semi-automatic pistols, a silencer for one of the pistols, and ammunition for the rifle and pistols.

B.  Proceedings Below

This appeal arises from a lawsuit originally styled "Leslie L. Green, Administrator of the Estate of Christie D. Green versus Armor Holdings, Inc. of America (a Delaware corporation), Defense Technology Corporation of America (a Delaware corporation), Defense Technology Corporation of America, John B. Buckovich, and George Ingram."[1]  Katina Green was subsequently substituted as administrator.

---

[1] In her motion for judgment, the administrator referred to the two Defense Technology corporations as "[t]he defendant Defense Technology Corporation of America (a Delaware corporation), and/or the defendant Defense Technology Corporation of America (together, 'Defense Technology')." Thus, it would appear the two corporations are in fact the same.  However, this confusion is compounded by the administrator's subsequent non-suit of Defense Technology Corporation of America, but not Defense Technology Corporation of America (a Delaware corporation).  Because the record does not indicate whether the two Defense Technology corporations are in fact the same, the three corporate defendants are hereinafter referred to in the following manner:  Armor Holdings, Inc. of America (a Delaware corporation) as "Armor Holdings"; Defense Technology Corporation of America (a Delaware corporation) as "Delaware Defense Technology"; and Defense Technology Corporation of America, with no state of corporation designated, as "DTCA."

The trial court granted a motion to sever the trial of the three corporate defendants from that of Buckovich and Ingram. The administrator then non-suited Armor Holdings and DTCA on January 28, 2002. In a jury trial involving only Delaware Defense Technology, the jury returned a defense verdict. The trial court entered judgment in favor of Delaware Defense Technology. The administrator filed a timely petition for appeal, Record Number 021017, which we refused.

The case then proceeded to trial against defendants Buckovich and Ingram. The administrator, in her claims against Buckovich, alleged gross negligence in his training and supervision of Ingram and in his planning of the operation. In her claims against Ingram, the administrator alleged gross negligence in his use of the frangible rounds and breaching of the door during the operation. The plaintiff also sought punitive damages.

At trial, plaintiff presented evidence of the manufacturer's specifications for the use of the frangible rounds, the training for SWAT team members in the firing of the frangible rounds, Ingram's conduct in firing the frangible rounds during the evening in question, and the trajectory of the five frangible rounds fired by Ingram. With respect to the manufacturer's specifications for the use of the frangible rounds, the manufacturer's advertisements stated that the "No.

6

22 T.K.O. (Tactical Knock-Out) 12 Gauge Frangible Slug" was "made of compressed powdered zinc, which disintegrates into a fine powder upon impact with the target.  The only possible fragmentation would be from the target area rather than the slug itself."  The manufacturer also stated, "When properly applied, [the frangible] round is capable of defeating door lock mechanisms, door knobs, hinges, dead bolts, safety chains, and padlocks on both hollow and solid wooden doors, as well as standard hollow industrial doors."

A reasonable inference from the manufacturer's specifications is that the "target" is a metal object associated with a door.  Such an inference was advanced by the city attorney herself when, in argument before the trial court, the following colloquy took place:

> CITY ATTORNEY:  Furthermore, the evidence is that Ms. Green was killed by fragments of a round, which indicate the rounds hit something.  The inference is that the rounds hit something in the door.
>
> THE COURT:  Something other than wood?
>
> CITY ATTORNEY:  Something other than wood, something that broke them apart.  All of the evidence indicates [Ingram] applied the rounds to the target area.  In fact, the testimony was that his first round was fired directly in the area of the dead bolt.  The evidence is that the dead bolt is on the floor and that part of the doorknob is on the floor.
> The only permissible inference from that is that he fired the rounds in

accordance with his training.  It struck a metal object in the door and struck something hard enough to breach it. Obviously, the rounds hit something and broke into parts.  The evidence is that Ms. Green was killed by fragments.

That a metal mechanism attached to the door is the "target" is further bolstered by the testimony of Ingram himself:

> Q.   And in connection with the first [round] that you fired at the door, at what point of the door did you point the barrel of the shotgun?
> A.   The sights were placed on the lock, the area between the dead bolt lock and where the frame is there's a small area that's exposed and that's the area that we shot at.
> Q.   And why is it that you shot at that area between the dead bolt lock and the frame?
> A.   That's where the throw goes into the frame from the lock.
> Q.   So you were shooting at the throw, the dead bolt throw for that first shot, correct?
> A.   Correct.

Buckovich supports this conclusion as well:

> Q.   At any time as far as you are aware, has anyone on behalf of the Richmond Police Department fired rounds purposefully below a lock on a wooden door in order to determine the extent to which the round would penetrate the door if the round did not come in contact with the metal lock?
> A.   Once again, I haven't.  I don't know what Captain Beadles and Lieutenant Bennett, if they have.  So I haven't done that personally.
> Q.   Why not?

A.    Because that wasn't the way the round was intended to be used.  It was intended to be used to be fired at the locking mechanism.

. . . .

Q.    When you were firing frangible rounds, did you ever purposefully aim at a part of the door that you thought did not have hardware in it?
A.    Only time I've ever fired it was at hinges or the locks.
Q.    And why have you never purposefully aimed at a part of the door that you did not think had hardware in it?
A.    As I stated earlier, that's not the way the round is intended to be used, so I never did it.

This definition of "target" is further supported by training materials for the SWAT team that direct, "AIM SHOTGUN WITH A 45-DEGREE DOWN ANGLE AT THE LATCHBOLT BETWEEN THE LOCK AND THE FRAME."

As part of SWAT team training, members received training on breaching techniques.  Ingram received this training, and also served as an instructor.  The plaintiff introduced into evidence the lesson plan for the course on breaching techniques.  The lesson plan stated that the frangible round is to be used to "[a]ttack the throw area of the dead bolt usually."  When focusing on shotgun breaching, the lesson plan listed seven "intelligence requirements":  the composition of the door, the composition of the frame, the swing on the door,

9

the locking options, the attaching methods, any additional hardware, and the shotgun aiming points.

The plaintiff also introduced deposition testimony regarding Ingram's conduct in firing the frangible rounds during the breaching operation on December 29, 1998.[2]  While Ingram was unsure of the exact angle, he testified that he fired all five frangible rounds at a downward angle.  Ingram stated that each shot was approximately an inch below the one before it, and that he fired them in a vertical line below where he concluded the latchbolt to be located.  When asked whether he considered "that there might be people in the room on the other side of the door," Ingram responded, "You're always aware of that, the room that you're going into might be occupied.  You're always aware of that."  It was undisputed that fragments from the frangible rounds fired by Ingram caused Green's death.

At the conclusion of the plaintiff's case-in-chief, Buckovich and Ingram moved to strike the evidence.  The trial court granted Buckovich's motion and denied Ingram's motion. Ingram then declined to present any evidence and renewed his motion to strike.  The trial court took Ingram's motion under

_____

[2] During the trial below, the administrator's presentation of evidence began with the videotaped deposition testimony of Ingram.  The administrator subsequently called Ingram to

10

advisement and submitted the case to the jury, with Ingram as the only defendant.  The jury was unable to reach a verdict, and Ingram renewed his motion to strike.  The trial court granted Ingram's motion and entered judgment in favor of Ingram.

The administrator filed a timely petition for appeal.  At the outset, it must be noted that while the style of this case includes Delaware Defense Technology, this appeal involves only the administrator as appellant and Ingram as appellee.

## II.  Analysis

### A.  Motion to Strike

In her first assignment of error, Green contends, "As a matter of law, the trial court in this wrongful death action erred in concluding that the facts did not present a jury issue as to whether the actions of a police officer were willful and wanton or grossly negligent, under the circumstances of this case."

### 1.  Standards of Review

The standard under which a trial court should review the evidence at trial before granting a motion to strike "requires the trial court to accept as true all the evidence favorable to the plaintiff as well as any reasonable inference a jury

---

testify in person as an adverse witness.  The testimony cited is from Ingram's videotaped deposition.

11

might draw therefrom which would sustain the plaintiff's cause of action." Upper Occoquan Sewage Authority v. Blake Construction Co., 266 Va. 582, 590 n.6, 587 S.E.2d 721, 725 n.6 (2003) (citing Austin v. Shoney's, Inc., 254 Va. 134, 138, 486 S.E.2d 285, 287 (1997)). A trial court "is not to judge the weight and credibility of the evidence, and may not reject any inference from the evidence favorable to the plaintiff unless it would defy logic and common sense." Id. A trial court should resolve any reasonable doubt as to the sufficiency of the evidence in the plaintiff's favor and should grant the motion only when " 'it is conclusively apparent that [the] plaintiff has proven no cause of action against defendant.' " Williams v. Vaughan, 214 Va. 307, 309, 199 S.E.2d 515, 517 (1973) (quoting Leath v. Richmond, F. & P. R.R., 162 Va. 705, 710, 174 S.E. 678, 680 (1934)).

On appeal, we review a trial court's judgment striking the evidence, considering the facts in the light most favorable to the plaintiff and drawing all fair inferences from those facts. Perdieu, 264 Va. at 411, 568 S.E.2d at 704.

## 2. Gross Negligence

Both parties agree that under Virginia law, a government agent such as Ingram is immune from suit for simple negligence but not for gross negligence. Colby v. Boyden, 241 Va. 125, 128, 400 S.E.2d 184, 186 (1991). Additionally, both parties

agree the trial court correctly instructed the jury below that gross negligence is "that degree of negligence which shows indifference to others as constitutes an utter disregard of prudence amounting to a complete neglect of the safety of [another]. It must be such a degree of negligence as would shock fair minded [people] although something less than willful recklessness." Ferguson v. Ferguson, 212 Va. 86, 92, 181 S.E.2d 648, 653 (1971); see also Meagher v.Johnson, 239 Va. 380, 383, 389 S.E.2d 310, 311 (1990).

The evidence from the manufacturer concerning the frangible rounds indicates that the rounds are designed to disintegrate "into a fine powder upon impact with the target." The SWAT team training information instructed that when using frangible rounds to breach a door like the one encountered by Ingram, the shotgun should be aimed "with a 45-degree down angle at the latchbolt between the lock and the frame." A reasonable jury could conclude from the evidence that the "target" is a metal mechanism attached to a door.

Ingram testified that he fired five frangible rounds. He testified that his first shot was between the deadbolt lock and the frame of the door, and that his four subsequent shots were each an inch successively lower in a vertical line. This method was employed despite the fact that the latchbolt was in a horizontal line from the deadbolt to the frame. From the

13

photographs introduced by the plaintiff, a jury could reasonably conclude that the shots were in a vertical pattern and below the location of the deadbolt lock. A reasonable jury could conclude that Ingram fired the frangible rounds into an area where there was only wood and no metal.

A reasonable jury could conclude that Ingram departed from instruction and training, and fired in a location below the lock rather than between the lock and the frame. Given Ingram's own testimony about assumptions made concerning the presence of people on the other side of the door, a reasonable jury could have concluded that Ingram acted "with that degree of negligence which shows indifference to others as constitutes an utter disregard of prudence amounting to a complete neglect of the safety" of others. The trial court's ruling to grant the motion to strike plaintiff's evidence was based upon the issue of gross negligence, not proximate causation. Viewed in the light most favorable to the plaintiff and drawing all fair inferences from these facts, the administrator presented sufficient evidence to constitute a jury question on the issue of gross negligence.

3. Willful and Wanton Negligence – Punitive Damages

As we recently explained,

A claim for punitive damages at common law in a personal injury action must be supported by factual allegations sufficient to establish

14

that the defendant's conduct was willful or wanton. Huffman v. Love, 245 Va. 311, 314, 427 S.E.2d 357, 359-60 (1993); Booth v. Robertson, 236 Va. 269, 273, 374 S.E.2d 1, 3 (1988); see Alfonso v. Robinson, 257 Va. 540, 546-47, 514 S.E.2d 615, 619 (1999). Willful and wanton negligence is action undertaken in conscious disregard of another's rights, or with reckless indifference to consequences with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another. Id. at 545, 514 S.E.2d at 618; Harris v. Harman, 253 Va. 336, 340-41, 486 S.E.2d 99, 101 (1997). Each case raising an issue concerning the sufficiency of a claim of willful and wanton negligence must be evaluated on its own facts. Alfonso, 257 Va. at 545, 514 S.E.2d at 618; Harris, 253 Va. at 341, 486 S.E.2d at 102; Huffman, 245 Va. at 315, 427 S.E.2d at 360.

Woods v. Mendez, 265 Va. 68, 76-77, 574 S.E.2d 263, 268 (2003).

The difference between ordinary negligence and gross negligence is one of degree; however, the difference between any form of negligence and causes of action for willful and wanton conduct, reckless conduct, or intentional misconduct is a matter of kind. Infant C. v. Boy Scouts of America, Inc., 239 Va. 572, 582, 391 S.E.2d 322, 327 (1990). "Negligence conveys the idea of heedlessness, inattention, inadvertence; willfulness and wantonness convey the idea of purpose or design, actual or constructive." Boward v. Leftwich, 197 Va. 227, 231, 89 S.E.2d 32, 35 (1955). Additionally, in Infant C. we explained the difference between willful and wanton conduct

15

and intentional misconduct where we stated: "An actor guilty of intentional misconduct must intend to cause harm to another . . . An actor guilty of willful and wanton conduct intends his act, but not the resulting harm." 239 Va. at 582, 391 S.E.2d at 328 (citation omitted). Ill will is not a necessary element of willful and wanton negligence. Id. at 581, 391 S.E.2d at 327.

In this case, plaintiff has alleged willful and wanton conduct in support of a claim for punitive damages. Plaintiff's proof requires evidence of "actual or constructive consciousness that injury will result from the act done or omitted." Alfonso v. Robinson, 257 Va. 540, 545, 514 S.E.2d 615, 618 (1999). Upon review of the record in this case in the light most favorable to the plaintiff, the trial court did not err in striking the evidence with regard to the claim of willful and wanton conduct. The same evidence that supports a jury question on gross negligence does not necessarily support a jury question on willful and wanton conduct. Harris v. Harman, 253 Va. 336, 340-41, 486 S.E.2d 99, 101-02 (1997). On the facts presented, we agree that no reasonable juror could find that Ingram had actual or constructive knowledge that Green was on the other side of the door. His training required him to act as if there were people in the room, but there is no evidence of actual or constructive knowledge on

16

Ingram's part that there were people in the room. The plaintiff's evidence does not rise to the level where a reasonable jury could find that Ingram had conscious awareness of the danger, and probable consequences of his actions, and recklessly decided to proceed notwithstanding that awareness.

## B. Admissibility of Evidence

In her second assignment of error, the administrator argues, "As a matter of law, the trial court was wrong to conclude that evidence of heroin and guns was somehow relevant and hence admissible, where such evidence was not discovered until after the defendant police officer killed the plaintiff's decedent." Because this evidence was offered in support of the claims against Buckovich and he is no longer a defendant in the case, we need not address this assignment of error.

## III. Conclusion

For the reasons stated, we hold that the trial court erred in granting the motion to strike the plaintiff's evidence as it applied to the claim of gross negligence. However, the trial court did not err in granting the motion to strike the plaintiff's evidence as it applied to willful and wanton conduct and the request for punitive damages. We will remand the case for a new trial on the issue of gross negligence.

Affirmed in part,
reversed in part,
and remanded.

JUSTICE KINSER, with whom JUSTICE LACY and JUSTICE AGEE join, concurring in part and dissenting in part.

I respectfully disagree with the majority's holding that the circuit court erred in granting the motion to strike the plaintiff's evidence with regard to the claim of gross negligence. In my view, reasonable persons could not differ upon the conclusion that Sergeant George J. Ingram did not act with "utter disregard of prudence amounting to a complete neglect of the safety of [another person.]" Ferguson v. Ferguson, 212 Va. 86, 92, 181 S.E.2d 648, 653 (1971); accord Colby v. Boyden, 241 Va. 125, 133, 400 S.E.2d 184, 189 (1991). Thus, the issue was a question of law for the circuit court. Graddy v. Hatchett, 233 Va. 65, 69, 353 S.E.2d 741, 743 (1987).

Gross negligence is the "absence of slight diligence, or the want of even scant care." Town of Big Stone Gap v. Johnson, 184 Va. 375, 378, 35 S.E.2d 71, 73 (1945); accord Frazier v. City of Norfolk, 234 Va. 388, 393, 362 S.E.2d 688, 691 (1987). The thrust of the plaintiff's argument as well as the holding of the majority is that Sergeant Ingram was grossly negligent because he fired four frangible rounds into a location below the deadbolt lock, an area of the door

containing only wood, instead of firing only in the area between the lock and the frame of the door, where the latchbolt was situated.  According to the plaintiff, this method of firing the last four frangible rounds violated the aiming rules requiring that shots be fired in a 45-degree downward angle at the latchbolt between the lock and the doorframe.

Sergeant Ingram, however, explained why, after he fired the first shot and the door would not open, he then fired the four subsequent rounds in a vertical pattern below the first round: "The door hadn't come open[], hadn't swung open on the first shot and how you work this is you shoot, you look, you shoot, you look, working in a pattern to clear it where the throw would be."  The angle of each shot was successively steeper, with the fifth shot having the steepest angle.  His purpose was to "dislodge the dead bolt and anything that might have jammed up getting that door open."

The forensic pathologist who performed an autopsy on the decedent's body did not find any whole or intact frangible rounds in her body.  Instead, only fragments of a frangible round were recovered on and in the decedent's body, as well as a gray powdery substance attributable to the frangible rounds.  Furthermore, the forensic pathologist testified that the fragments that entered the decedent's body followed a course

through the body from "front to back, right to left, and downward."

Based on these facts and the other evidence in the case, viewed in the light most favorable to the plaintiff, I conclude, as a matter of law, that Sergeant Ingram did indeed exercise diligence and care for the safety of another person. Stated differently, there was not the "absence of slight diligence, or the want of even scant care." Johnson, 184 Va. at 378, 35 S.E.2d at 73. Sergeant Ingram fired the five frangible rounds working downward in a vertical pattern in order to clear the area where the latchbolt was located and to dislodge the deadbolt and anything else that might be preventing the door from opening. Firing in this manner was consistent with Sergeant Ingram's training. Even on the plaintiff's theory that frangible rounds are designed to disintegrate into a powder solely upon impact with a metal object, and that the metal latching mechanism of a door must be the target of such rounds, the presence of only fragments on and in the decedent's body suggests that the rounds that struck her also partially hit metal. Sergeant Ingram acknowledged that he was trained to assume that someone might be on the other side of the door, and in my view, he did not act with "utter disregard of prudence amounting to complete neglect of the safety" of such a person. Frazier, 234 Va. at

20

393, 362 S.E.2d at 691. The word "utter" means "[c]omplete; absolute; total," Black's Law Dictionary 1582 (8th ed. 2004), and the word "disregard" means "[t]he action of ignoring or treating without proper respect or consideration." Id. at 506. So, the phrase "utter disregard" means to ignore completely or totally. In this case, fair-minded people could not conclude from the evidence that Sergeant Ingram completely ignored the safety of another as he fired the frangible rounds.

For these reasons, I respectfully concur, in part, and dissent, in part, and would affirm the judgment of the circuit court.