Present:  Kinser, C.J., Lemons, Millette, and Mims, JJ., and
Lacy and Koontz, S.JJ.

S. CHARLES VOLPE, CO-ADMINISTRATOR OF
THE ESTATE OF CHARLES OLIVER VOLPE, ET AL.

v.  Record No. 092583          OPINION BY JUSTICE WILLIAM C. MIMS
                                        April 21, 2011
CITY OF LEXINGTON

               FROM THE CIRCUIT COURT OF ROCKBRIDGE COUNTY
                       Michael S. Irvine, Judge

     The primary issue in this appeal is whether the City of

Lexington, which owned and operated a riverside park that

included a low-head dam, owed a duty to warn its invitees of

the dangers posed by the dam.  We also consider whether the

circuit court properly struck claims of gross negligence and

willful and wanton negligence.

                             BACKGROUND

     On April 23, 2006, Charles O. Volpe ("Charles") drowned

in the Maury River below a low-head dam during a visit to a

riverside park owned and operated by the City of Lexington,

Virginia ("the City").  His parents, S. Charles Volpe and Kim

A. Volpe ("the Volpes"), qualified as administrators of his

estate and filed suit against the City seeking damages for

gross negligence, willful and wanton negligence, and public

nuisance.  The matter proceeded to trial by jury, at the

conclusion of which the circuit court struck the ordinary

negligence claims and refused to instruct the jury on public

nuisance.[1]  The jury was unable to reach a verdict on the gross

negligence claim, and the circuit court granted a renewed

motion to strike that claim, finding that the danger posed by

the dam was open and obvious and therefore the City had no

duty to warn Charles.  We awarded the Volpes this appeal.

FACTS

In 1940, the City acquired the low-head dam, which

traverses the Maury River in the City at a bend in the river

known as Jordan's Point.[2]  The dam originally was constructed

to raise the level of the river, forming a millpond, so water

could be channeled into a millrace and used to power a mill.

By the 1990s, the mill had ceased operating but the dam and

the millpond remained.

The Jordan's Point dam is described as "low-head" because

water cascades over, rather than through, it.  As the water

level rises, more water flows over the top of the dam and the

velocity of the flow increases.  However, the surface of the

millpond remains calm and the heightened currents are not

apparent to common observation.  The pooled water may not

---

[1] It appears from the record that the trial court's refusal to instruct on nuisance was based on the Volpes' failure to submit jury instructions.  The circuit court did not reach the merits of the nuisance claim.

[2] At the time of Charles' death, City officials did not realize that the City owned the dam, which was part of a larger acquisition of riverside property.

appear higher than normal even when the volume of water flowing over the dam is several times greater than the normal rate.

When the water flow is high, it generates a dangerous condition on the downhill side of the dam called a hydraulic. The greater the flow of water over the dam, the more powerful the hydraulic. When a person is pulled into a powerful hydraulic, he may not be able to escape. The presence of such a potentially deadly hydraulic may not be apparent to common observation.

The hydraulic created by a low-head dam is unusually dangerous because it is uniform and spans the entire river. By contrast, naturally occurring hydraulics, often formed by boulders, are limited in size and uneven in shape. Consequently they usually will "kick [a person] to the left or right."

In January 1997, City officials formed a committee to plan a public park at the City-owned riverfront at Jordan's Point. At the initial committee meeting, participants offered a variety of suggestions regarding the proposed park, including "regained public access to the water." City officials planning the park viewed it as "a place where people should be able to swim."

3

In 1998 the City hired an architecture firm to create a master plan for the park. According to notes from its September 2, 1998 meeting, the committee and the park's architect were "concerned about safety from the beginning, but we want swimming." The master plan, dated August 23, 1999, set forth as a purpose of the park: "To provide a place for the citizens to access the River." The plan proposed using an existing tire dock, located 85 feet upstream from the dam, as the flatwater canoe launch. Part of the City's plan was to encourage and provide an opportunity for people to swim in the millpond. The City envisioned swimmers accessing the water from the tire dock and a grassy bank between the tire dock and the dam.

Thereafter, the committee met in October 1999. The minutes reflect that Andrew P. Wolfe, representing the Maury River Traditional Small Craft Association, questioned the location of the canoe launch due to concern of flooding. Committee member Carlton Abbott "acknowledged that the currently shown boat launch location is not ideal given the dam's proximity and crosscurrents." The minutes state that

4

Abbott "also mentioned that techniques are available such as a cable with drop straps to prevent boating accidents at dams."[3]

In 2001 the City submitted a grant application for the proposed park to the Virginia Department of Transportation ("VDOT"). The application stated that the "Safety Impact," in part, would be that "[s]afe flatwater and whitewater canoe launches will be established using [previous] pavement and other stream bank stabilization measures." City Manager T. Jon Ellestad testified that moving the canoe launch away from the dam was a justification for the grant. The City received $462,000 in grants from VDOT to create the Jordan's Point Park and implement the safety features proposed in the grant application. However, the City did not move the canoe launch from the tire dock. Likewise, prior to Charles' death the City did not take any safety precautions with respect to swimming in the river.

As planned, swimmers visiting the park accessed the millpond from the canoe launch. On most days, with very little water flowing over the top of the dam, the millpond was a placid pool with little detectable current. Swimmers

---

[3] In 2004, City Manager T. Jon Ellestad approached the owner of the property across the river from the city park about running a safety cable from the park to his property. The City never installed a safety cable.

climbed onto the dam without difficulty, and some jumped from the dam into the river below the dam.

On the day he died, Charles visited the park with his friend Bryc Talley ("Bryc").  Charles and Bryc planned to swim to the dam, climb onto it, and jump into the water below, as they previously had done many times without incident.  Bryc testified that the river appeared "like it did on any other day.  The water was pretty smooth and flat."  Bryc jumped into the millpond from the grassy bank between the tire dock and the dam.  He swam over to the tire dock and got out.  Then Charles entered the river from the grassy bank, and Bryc jumped in behind him.  The two swam toward the center of the dam, and the water "seemed pretty much how it did on any other day."

According to Bryc, "it wasn't until we got right up next to it that you could tell a significant difference in the current."  The current "was just instant how it picked up." It swept Charles, and then Bryc, over the dam.  Bryc found himself spinning in a hydraulic which he had never experienced, but managed to escape to shore.  Charles did not escape the hydraulic.  Police recovered his body more than 22 hours later at the base of the dam.

Defense witnesses testified that they also visited Jordan's Point on April 23, 2006, but would not swim because

the river appeared dangerous.  They testified that it had rained for several days and the river was "high," "turned up," "really white and brown," "muddy," and "obviously dangerous." From the park, they saw the water pour over the dam faster than usual.  Emily J. Heizer testified that she entered the river at the tire dock, but got out immediately because she felt a powerful current.  She stated: "the edge of the dam was all white, with the water rolling back, I guess, hitting it, all white."  She testified that the sound of water rushing over the dam was amplified, and that the conditions on that day were the worst she had seen.

### DISCUSSION

### A. DUTY TO WARN

The Volpes first assign error to the trial court's ruling that the City, as a matter of law, did not have a duty to warn Charles.  We review the trial court's ruling de novo, as "[t]he issue whether a legal duty in tort exists is a pure question of law."  Kellermann v. McDonough, 278 Va. 478, 487, 684 S.E.2d 786, 790 (2009).

It is undisputed that Charles had the status of an invitee, as the park and the millpond were "thrown open to the public and [Charles] enter[ed] pursuant to the purposes for which [the park was] open."  City of Richmond v. Grizzard, 205 Va. 298, 302, 136 S.E.2d 827, 830 (1964).  In Virginia, a

7

landowner owes an invitee "the duty of using ordinary care to maintain its premises in a reasonably safe condition and to warn . . . of any hidden dangers." Amos v. NationsBank, N.A., 256 Va. 344, 346, 504 S.E.2d 365, 366 (1998). In Blacka v. James, 205 Va. 646, 649, 139 S.E.2d 47, 50 (1964), we explained:

> the owner of a swimming pool or lake to which the general public is invited for a consideration must exercise ordinary care for the safety of his patrons. He must make reasonable provisions to guard against those accidents which common knowledge and experience teach are likely to befall those engaged in swimming and other aquatic sports for which he has provided facilities, but the owner is not an insurer of the safety of his patrons.

See also Knight v. Moore, 179 Va. 139, 146, 18 S.E.2d 266, 269 (1942).

An invitee has the right to assume that premises are reasonably safe "unless a dangerous condition is open and obvious." Roll 'R' Way Rinks, Inc. v. Smith, 218 Va. 321, 327, 237 S.E.2d 157, 161 (1977); see also Fobbs v. Webb Bldg. Ltd., 232 Va. 227, 229, 349 S.E.2d 355, 357 (1986) ("owner has no duty to warn its invitee of an unsafe condition which is open and obvious to a reasonable person exercising ordinary care for his own safety"); Knight, 179 Va. at 146, 18 S.E.2d at 269 ("such notice is not required where the dangerous

8

condition is open and obvious, and is patent to a reasonable person exercising ordinary care for his own safety").

This Court has held that the danger of drowning in an excavated quarry was "natural, open, and obvious," despite a sheer, manmade drop-off from a shelf of knee-deep water. Washabaugh v. Northern Virginia Construction Co., 187 Va. 767, 773, 48 S.E.2d 276, 279 (1948). We explained:

> While tragic accidents of the nature disclosed are always possible, they are not any more likely to happen in this artificial pond than in a natural stream of water. Such danger is natural, open, and obvious, and is ordinarily encountered in most places where children gather to wade or swim.

Id. Under Washabaugh, riparian landowners in Virginia do not, in the absence of consideration, owe a duty to warn of the natural, "ordinarily encountered" hazards of a body of water. Id.

While we agree with the City that the natural, "ordinarily encountered" dangers of the Maury River at Jordan's Point were as a matter of law open and obvious to Charles, we do not agree that a deadly, hidden hydraulic created by the unusually strong current at the low-head dam was open and obvious as a matter of law.

A case from our neighboring jurisdiction of West Virginia is instructive on the matter. In White v. Kanawha City Co., 34 S.E.2d 17 (W. Va. 1945), the Supreme Court of West Virginia

9

reviewed the drowning of a twelve-year-old child in a pool of water created by a dam.  Id. at 18.  The court observed that "the mere existence of an unguarded [body] of water . . . does not of itself render the owner liable for the death of a child drowned therein," but "if some feature or element of the instrumentality or premises operates as a hidden danger or trap, liability may arise against the owner."  Id. at 19.  The court held that the plaintiff failed to allege facts "which would indicate that the pool or dam in question was more dangerous than an ordinary pool or dam would inherently and unavoidably be."  Id. at 19-20.

In Perkins v. Byrnes, 269 S.W.2d 52 (Mo. 1954), the Supreme Court of Missouri reviewed a drowning that occurred in a hydraulic at the base of a mill dam within a waterfront resort.  It found that the evidence was that the river was " 'up' or 'swollen,' even 'high,' " when decedent entered the water.  Id. at 54.  It held that the question of the resort's negligence was for the jury, as "a swollen river with a hidden or deceptive undercurrent is a circumstance upon which reasonable minds could differ."  Id. at 55.

The record in this case shows that the hydraulic at Jordan's Point was unlike any naturally occurring feature of a river.  Specifically, the increased current above the manmade dam and the hydraulic created below were not always visible to

a swimmer and were not always present. Unlike a natural hydraulic, the hydraulic in which Charles drowned spanned the river in a straight line, making escape exceptionally difficult.

Therefore, the circuit court erred in holding as a matter of law that the dam presented an open and obvious danger.[4] See Washabaugh 187 Va. at 773, 48 S.E.2d at 279. This factually specific determination was an issue for the jury. See Hoar v. Great Eastern Resort Management, Inc., 256 Va. 374, 386, 506 S.E.2d 777, 784-85 (1998) (conflict in testimony as to whether a steep drop-off at edge of ski slope was an open and obvious condition "presented a typical issue for jury determination"); Fultz v. Delhaize America, Inc., 278 Va. 84, 89, 677 S.E.2d 272, 274-75 (2009) (where reasonable minds could differ, question as to whether defect is open and obvious was for the jury).

### B. GROSS NEGLIGENCE

---

[4] The question of whether the dam presented an open and obvious danger initially was presented to the jury, prior to the court granting the renewed motion to strike when the jury could not reach a verdict regarding the gross negligence claim. Instruction 11, agreed to by the parties, stated, in part: "An occupant of premises does not guarantee an invitee's safety, but has the duty . . . to warn an invitee of any unsafe condition about which the occupant knows, or should know, unless the unsafe condition is open and obvious to a person using care for his own safety."

We now turn to the issue of the circuit court striking the Volpes' evidence of the City's gross negligence. We recently have explained the applicable standard of review:

> When ruling on a motion to strike a plaintiff's evidence, a trial court is required to accept as true all evidence favorable to a plaintiff and any reasonable inferences that may be drawn from such evidence. The trial court is not to judge the weight and credibility of the evidence, and may not reject any inference from the evidence favorable to the plaintiff unless it would defy logic and common sense. On appeal, when this Court reviews a trial court's decision to strike a plaintiff's evidence, we likewise view the evidence in the light most favorable to the plaintiff.

TB Venture, LLC v. Arlington County, 280 Va. 558, 562-63, 701 S.E.2d 791, 793 (2010) (internal citations and quotation marks omitted).

In Chapman v. City of Virginia Beach, 252 Va. 186, 475 S.E.2d 798 (1996), we defined gross negligence as:

> the utter disregard of prudence amounting to complete neglect of the safety of another. It is a heedless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight diligence, or the want of even scant care. Several acts of negligence which separately may not amount to gross negligence, when combined may have a cumulative effect showing a form of reckless or total disregard for another's safety. Deliberate conduct is important evidence on the question of gross negligence. Whether gross negligence has been established is usually a matter of fact to be decided by a jury.

Id. at 190, 475 S.E.2d at 800-01 (internal citations and quotation marks omitted).

12

The Volpes argue that the circuit court erred in finding their evidence insufficient for a jury to find that the City had acted in a grossly negligent manner.  Applying the standard as set forth in Chapman, and viewing the evidence in the light most favorable to the Volpes, we agree.

City Manager Ellestad testified that he knew the river could be particularly dangerous in certain conditions because of the proximity of the low-head dam and could be hazardous even when the millpond appeared "relatively normal."  Director of Public Works David Woody testified that he was aware of the existence of the hydraulic during the planning of the park, and he knew that the accelerating currents at the top of the dam and the hydraulic below were present only in certain conditions.  He also knew that in certain conditions, the hydraulic would be deadly.  It is undisputed that despite the City's knowledge of these dangers, prior to Charles' death the City did not take any safety precautions for its invitees swimming in the river.

On these facts, we find that "reasonable persons could differ upon whether the cumulative effect of these circumstances constitutes a form of recklessness or a total disregard of all precautions, an absence of diligence, or lack of even slight care."  Id. at 191, 475 S.E.2d at 801.  We hold that there was credible evidence to support a jury finding of

13

gross negligence.  The trial court erred in striking the Volpes' evidence when the jury failed to return a verdict.

## C. WILLFUL AND WANTON NEGLIGENCE

The Volpes next assign error to the circuit court striking their claim for willful and wanton negligence.  As set forth above, in deciding whether the Volpes established a prima facie showing of willful and wanton negligence, the circuit court was "required to accept as true all evidence favorable" to the Volpes.  TB Venture, 280 Va. at 562-63, 701 S.E.2d at 793.  We also view the evidence in the light most favorable to the Volpes.  See id.

The tort of willful and wanton negligence has been characterized as "a spirit of mischief, criminal indifference, or conscious disregard for the rights of others."  Infant C. v. Boy Scouts of America, Inc., 239 Va. 572, 581, 391 S.E.2d 322, 327 (1990).  In Infant C., we explained:

> The hallmark of this species of tortious conduct is the defendant's consciousness of his act, his awareness of the dangers or probable consequences, and his reckless decision to proceed notwithstanding that awareness.  Because such consciousness and awareness are prerequisites, the use of the term "negligence," in defining the tort, is a misnomer.

Id. at 581-82, 391 S.E.2d at 327.

Here, taking the evidence in the light most favorable to the Volpes, we accept that the City knew that the dam could

14

present dangers in certain conditions.  The evidence, however, did not establish that City officials acted with a spirit of mischief, criminal indifference, or conscious disregard for the rights of swimmers.  In fact, the evidence did not establish that the City, prior to Charles' death, even knew that swimmers climbed on the dam and jumped into the water below.

Accordingly, the circuit court properly granted the City's motion to strike the evidence for the claim of willful and wanton negligence.[5]

CONCLUSION

For the reasons stated above, we will reverse the judgment of the circuit court holding that the City had no duty to warn and striking the Volpes claim of gross negligence, affirm the circuit court's judgment striking the Volpes' claim of willful and wanton negligence, and remand the case for further proceedings consistent with this opinion.

<u>Affirmed in part,
reversed in part,
and remanded.</u>

---

[5] Because the circuit court did not reach the nuisance claim on the merits, we need not address that assignment of error, and that cause of action will be available to the Volpes on retrial.

15