# CIRCUIT COURT OF AUGUSTA COUNTY

Deborah Brooks,
individually,
and Deborah Brooks,
member of Wintergreen
Property Owners

v.

Jeffrey D. Stallings,
Cheri Stallings,
and T. Matthew Miner

March 3, 2015

Case No. CL13001004-00

BY JUDGE VICTOR V. LUDWIG

I will say at the outset that the Court is overruling the Defendants' demurrers.

The pleadings and allegations in this case are sufficiently complex and interwoven as to require the Court to address the facts alleged (if for no other reason than to define terms) before I can properly describe the nature of the demurrers before the Court. Having said that, what follows is but a brief summary of the allegations, sufficient only to sketch the outline of the metaphorical forest of detail contained in the amended complaint (the AC).[1] What immediately follows is, at most, a selectively pruned introduction; I will describe other allegations in the context of addressing the specific components of the demurrers that the defendants have filed (the Stallings Demurrer and the Miner Demurrer).

## I. *Facts*

Deborah Brooks owns property at Wintergreen (the Brooks Property) adjacent to property (the Stallings Property) owned by Jeffrey D. Stallings and Cheri Stallings (collectively, the Stallingses, and, where necessary, identified by each individual's name). Both of those properties abut an Open Space Area[2] along the rear boundary lines. The parties' ownership in their respective properties is subject to the Wintergreen Declarations (the WD) and the Association Declarations (the AD). Brooks and Jeffrey are members of the Association.

The Stallingses engaged the services of T. Matthew Miner to perform some work on trees on the Stallings Property, but, in the event, Miner also cut one tree on the Brooks Property, damaged one tree on the line between the Open Space Area and the Brooks Property, and damaged two trees in the Open Space Area. Although the Stallingses (or Miner) had permission to work on the Stallings Property, they had no permission to work elsewhere, they did so without ascertaining the boundary lines (as they were required to do), the work was improperly done, and it was done in violation of the requirements of the WD and the AD. As a consequence, Brooks has

---

[1] I am not complaining that it is over-detailed. It is true, however, that one must make a flow chart or computer tree diagram to follow the counts (and even then it is not always entirely clear in what capacity Brooks is asserting her claim), and the blending of the nature of the claims and the various possibilities of the posture that Brooks is assuming in some or all of them makes an orderly analysis difficult.

[2] The Open Space Areas are identified in the Declaration of Rights, Restrictions, Affirmative Obligations and Conditions Applicable to All Property in Wintergreen (the WD), and, when conveyed to the Wintergreen Property Owners Association, Inc. (the Association), became "Common Properties." *See* Wintergreen Declaration Part III, Section 12. "Common Properties" are defined in Article I(s) of the Amended and Restated Declaration of Covenants and Restrictions of the Wintergreen Property Owners Association and a first addendum to it (collectively, the AD) as "those tracts of land . . . which are owned by or leased to the Association and designated in said deed as 'Common Properties . . . .' All Common Properties are to be devoted to and intended for the common use and enjoyment of the owners." As I said, it is pretty complicated.

suffered damage, which she seeks to redress individually and as a member of the Association.

## II. *Basis for Demurrers*

### A. *The Stallings Demurrer*

The Stallings Demurrer is not pleaded in a particularly surgical way, although that is driven, to some extent, by the drafting of the AC. However, the basic thrust of the Stallings Demurrer is that, to the extent that Brooks asserts any claim on the basis of the provisions of the WD or the AD, she has no standing, either as an individual or as a member of the Association to do so; further, that she has no standing pursuant to Code § 55-515(A), a provision of the Virginia Property Owners' Association Act (the VPOAA or the Act). Moreover, the Stallingses assert that, even if Brooks could have standing under the WD, the AD, or the statute, this is not a proper case. Finally, even if Brooks has standing to bring the action (in whatever capacity), and if this is a proper case, she cannot pursue the remedy of damages, compensatory or punitive as to all claims, or punitive damages as to Counts IV and VI. In summary, the Stallingses argue (a) that Brooks has no standing to ask for relief pursuant to the WD, the AD, or the statute, but if she might, (b) this is not a proper case for her to assert that, but if it is, (c) she cannot seek damages as a remedy.

Not all of that can be gleaned from the Stallings Demurrer; some of it comes from the Stallingses' memorandum, but it does all relate to the issue of standing that the Stallings Demurrer raises.

### B. *The Miner Demurrer*

Miner maintains that Brooks is not entitled to punitive damages as claimed in Counts V and VI of the AC because she has not pleaded "facts sufficient to form the basis for a claim of punitive damages," and solely as to Count VI, her membership in the Association does not give her "the right" (I assume standing) to pursue punitive damages.

## III. *Analysis*

### A. *Legal Standard*

A demurrer tests whether a complaint states a sufficient basis to establish a cause of action for which relief can be granted. *Grossmann v. Saunders,* 237 Va. 113, 119 (1989). In addition, a demurrer does not test the strength of the proof but the legal sufficiency of the facts alleged in the pleadings. *Eagle Harbor, L.L.C. v. Isle of Wight County,* 271 Va. 603, 611 (2006). For the purposes of a demurrer, the moving party admits all of the material,

well-pleaded facts in the pleadings, including those expressly alleged, those that can fairly be viewed as impliedly alleged, and all reasonable inferences arising from the facts alleged. *Rosillo v. Winters,* 235 Va. 268, 270 (1988). In addition, "[o]n demurrer, a court may examine not only the substantive allegations of the pleading attacked but also any accompanying exhibit mentioned in the pleading." *Flippo v. F & L Land Co.,* 241 Va. 15, 17 (1991). However, "a demurrer does not admit the correctness of the pleader's conclusions of law." *Fox v. Custis,* 236 Va. 69, 71 (1988) (citations omitted). As long as the complaint contains sufficient allegations to inform a defendant of the nature and character of the claim, it is unnecessary for the pleader to descend into statements giving details of proof. *CaterCorp, Inc. v. Catering Concepts, Inc.,* 246 Va. 22, 24 (1993) (citation omitted). At the same time, to survive a demurrer, a pleading must be made with "sufficient definiteness to enable the court to find the existence of a legal basis for its judgment." *Eagle Harbor, L.L.C.* at 611 (*quoting Moore v. Jefferson Hospital, Inc.,* 208 Va. 438, 440 (1967)). And, where the plaintiff's allegations, if true, are sufficient to state a cause of action, the demurrer should be overruled. *CaterCorp,* at 29.

It is in light of those principles that I will consider the Defendants' Demurrer.

### 1. *Standing in General*

Before looking at the issue of Brooks's standing regarding any specific claim or remedy, the better course is to assess the Stallingses' contention in general and then consider it with respect to the specific claims.

a. Looking first to the relevant provision of the WD, that document provides, in part, as follows:

> In the event of a violation or breach of any of the restrictions contained herein by *any property owner*, or agent of such owner, the owners of properties in the neighborhood or subdivision, or any of them, jointly or severally, *shall have the right to proceed at law or in equity to compel compliance to the terms hereof* or to prevent the violation or breach in any event.

WD, Part VI, § 2.[1] The Stallingses interpret this authorization narrowly. They assert that the only purpose of the individual owner's action would be to compel compliance with the covenants or prevent a violation of

---

[1] The particular restriction at issue is the one that provides: "In order to protect the natural beauty . . . of all properties . . . [n]o trees shrubs or other vegetation may be removed without the written approval of the Company." *Id.* at Part II, § 2.

them. That assumes one (perhaps both) of two things, neither of which is clear. First, it assumes that the purpose clause (to compel compliance, etc.) limits both the action at law as well as the action in equity. That ignores the perfectly acceptable reading of the sentence that could authorize an owner (a) to proceed at law (perhaps for damages), or, if the owner wanted to compel compliance or prevent a violation of the covenants, (b) to proceed in equity for the purpose of achieving that goal. The two are not mutually exclusive, nor is it necessary to limit the action at law to the purpose to be achieved by an action in equity. Second, even if the only approved purpose for an owner's exercising his right under this provision were to achieve compliance, a suit in damages could very well accomplish the goal by inflicting sufficient financial discomfort to deter continued or further non-compliance.

Considering this provision in isolation, Brooks has standing to bring an action for damages pursuant to the WD.

b. Looking second to the relevant provision of the AD, that document provides, in part, as follows:

> The easements of enjoyment created hereby shall be subject to the following, in addition to being subject to the provisions of the Virginia Property Owners' Association Act § 55-508 *et seq.* Code of Virginia (1950), as amended (the "Act"), including the due process provisions § 55-513: [and then it specifies some rights of the Association to exercise authority regarding some issues regarding assessments, none of which is relevant to the instant inquiry].

AD, Article IV, § 3.[1] Further, the AD provides:

> *The Association shall be authorized but not required to* provide the following services . . . .
> (10) *To take any* and all *actions necessary to enforce all covenants and restrictions affecting the Properties.*

*Id.* (emphasis added). Finally, the AD provides:

> Enforcement of these covenants and restrictions shall by any proceeding at law or in equity against any person, persons, or entity violating or attempting to violate or circumvent any covenant or restriction, either to restrain violations or to recover damages . . . and failure by the Association or any Member . . . to enforce any covenant or restriction herein

---

[1] There is no definition of the "easements of enjoyment" contained in the AD.

contained for any period of time shall in no event be deemed a waiver or estoppel of the right to enforce the same thereafter.

*Id.* § 4. Not only does this provision specifically permit the "Member" to enforce the covenants and restrictions, but the final independent clause, referring to "any covenant or restriction" defines the scope of what the "Member" may enforce.

Article VII, § 1, provides that "no . . . landscaping [shall] be done" without approval of the Architectural Review Board. At this stage, I draw the reasonable inference that what Stallings, through his agent, Miner, did with respect to the trees in question amounts to landscaping. Landscaping is an action "to modify or ornament (a natural landscape) by altering the plant cover." *Available at,* http://www.merriam-webster.com/dictionary/landscape.

The provisions of Article IV, § 3, expressly incorporate the provisions of Code § 55-515(A) (by necessary implication) and § 55-513 (by explicit reference). Hence, the Court must consider the language and limitations of the VPOAA. However, initially considering only the AD, it is clear that the Association is permitted to, but need not, act to enforce covenants and restrictions, so it can hardly be maintained that the Association has the exclusive authority to act. That conclusion is confirmed by Article IV, § 3(b), which clearly contemplates that a "Member" may enforce the covenants and restrictions and may do so "by any proceeding at law . . . to recover damages."

Considering this provision in isolation, Brooks has standing to bring an action for damages pursuant to the AD. However, given the specific incorporation of the VPOAA, the issue cannot be considered in isolation.

c. The relevant provisions of the VPOAA are Code §§ 55-515(A) and 55-513. Those statutes provide, in part:

Every lot owner . . . shall comply with all lawful provisions of this chapter and all provisions of the declaration. Any lack of such compliance shall be grounds for an action or suit to recover sums due, for damages or injunctive relief, or for any other remedy available at law or in equity, maintainable by the association, or by its board of directors or any managing agent on behalf of such association, *or in any proper case, by one* or more *aggrieved lot owners* on their own behalf or as a class action. Except as provided in subsection B, the prevailing party shall be entitled to recover reasonable attorney fees,

costs expended in the matter, and interest on the judgment as provided in § 8.01-382.

Code § 55-515(A) (emphasis added).[1] The statute clearly contemplates that a violation of the restrictions "shall be grounds for an action . . . to recover damages" and that the suit may be brought by an individual lot owner (although only "in a proper case," a limitation that I will consider below).

> Except as otherwise provided in this chapter, the board of directors shall have the power to . . . enforce rules and regulations with respect to use of the common areas . . . , except where expressly reserved by the declaration to the members.

*Id.* § 55-513(A).

> The board of directors may file or defend legal action in general district or circuit court that seeks relief, including injunctive relief arising from any violation of the declaration or duly adopted rules and regulations.

*Id.* § 55-513(E).

It may be that it is to Code § 55-513(A) that the Stallingses allude in paragraph 9 of the Stallings Demurrer,[2] although they do not identify it there. From this language, the Stallingses argue that the power to enforce the restrictions is not "expressly reserved by the declarations to the members." However, rather than construing the provision as a limitation on the authority of the owners, it appears to the Court that it is a limitation on the authority of the board of directors. It certainly is not a grant of an "irrevocable power as attorney-in-fact on behalf of the unit owners' association," *id.* § 55-79.80(B) (about which, more later); rather, it is more akin to granting the board standing to act, but not granting it exclusive authority to act, and restricting its standing if the power is expressly reserved to the members.

---

[1] "'Declaration' means any instrument, however denominated, recorded among the land records of the county or city in which the development or any part thereof is located, that either (i) imposes on the association maintenance or operational responsibilities for the common area or (ii) creates the authority in the association to impose on lots, or on the owners or occupants of such lots, or on any other entity any mandatory payment of money in connection with the provision of maintenance and/or services for the benefit of some or all of the lots, the owners or occupants of the lots, or the common area. 'Declaration' includes any amendment or supplement to the instruments described in this definition . . . ." Code § 55-509.

[2] That paragraph alleges: "Plaintiff may enforce declarations 'in a proper case' only if she is expressly entitled, pursuant to the provisions of the relevant declarations, to pursue the specific claims and remedies she seeks."

That interpretation is bolstered by the fact that the General Assembly thought it necessary to create an irrevocable power for the unit owners' association in the Condominium Act, Code §§ 55-79.39 *et seq.*, despite the fact that it had already provided the unit owners' association "standing to sue in its own name for any claims or actions related to the common elements as provided in subsection B of § 55-79.80." *Id.* § 55-79.53(A). The legislature did not, however, provide such an irrevocable power as attorney-in-fact to the board in the VPOAA. Hence, recognizing that the owners may act to enforce the restrictions in a proper case and that there is no exclusive power for the board of directors to act in any case, Code § 55-513(A) provides standing to the board of directors to act unless the power to act is expressly reserved to the members, but standing for the board to act is not the same as exclusive authority to act.

Considering this provision, Brooks has standing to bring an action for damages pursuant to the VPOAA, conditioned only on the meaning of "a proper case."

d. Regarding the issue of whether this is a "proper case," the Stallingses rely on the case of *Kuznicki v. Mason,* 273 Va. 166 (2007).

The parties are well aware of the facts in that case so a brief description here will do. The Kuznickis owned a condominium unit directly above the Masons' unit. The families shared enjoyment of a small yard used partly for recreational purposes but in which was located the cooling equipment for the Kuznickis and the Masons. When the Masons replaced their cooling equipment with equipment that was slightly larger, the Kuznickis sued. Relying on the provisions of the Condominium Act, specifically, Code §§ 55-79.53(A) and 55-79.80(B), the Masons argued that the Kuznickis did not have standing, and the Supreme Court of Virginia agreed.

The Stallingses' reliance on the *Kuznicki* decision is misplaced, if, for no other reason, because the Court in *Kuznicki* decided the case on the basis of the Condominium Act rather than the VPOAA. For the sake of clarity, I will refer both to the Code provisions in the Condominium Act on which the Court based its conclusions in the *Kuznicki* case and the parallel provisions in the VPOAA, which are applicable to the case at bar. I think the following will illustrate most expeditiously the fact that the provisions are remarkably similar in most ways, but determinatively distinctive in others.

Property Owners' Association Act:

> § 55-509. "Common area" means property within a development which is owned, leased or required by the declaration to be maintained or operated by a property owners' association for the use of its members and designated as common area in the declaration.

§ 55-515. *Compliance with Declaration*. A. Every lot owner, and all those entitled to occupy a lot shall comply with all lawful provisions of this chapter and all provisions of the declaration. *Any lack of such compliance shall be grounds for an action or suit to recover sums due, for damages or injunctive relief, or for any other remedy available at law or in equity, maintainable by the association, or by its board of directors or any managing agent on behalf of such association, or in any proper case, by one or more aggrieved lot owners on their own behalf or as a class action.* Except as provided in subsection B, the prevailing party shall be entitled to recover reasonable attorney fees, costs expended in the matter, and interest on the judgment as provided in § 8.01-382. This section shall not preclude an action against the association and authorizes the recovery, by the prevailing party in any such action, of reasonable attorney fees, costs expended in the matter, and interest on the judgment as provided in § 8.01-382 in such actions.

§ 55-513(E). The board of directors may file or defend legal action in general district or circuit court that seeks relief, including injunctive relief arising from any violation of the declaration or duly adopted rules and regulations.

§ 55-513. *Adoption and Enforcement of Rules*. A. Except as otherwise provided in this chapter, the board of directors shall have the power to establish, adopt, and enforce rules and regulations with respect to use of the common areas and with respect to such other areas of responsibility assigned to the association by the declaration, except where expressly reserved by the declaration to the members. . . . Rules and regulations may be enforced by any method normally available to the owner of private property in Virginia, including, but not limited to, application for injunctive relief or actual damages, during which the court may award to the prevailing party court costs and reasonable attorney fees.

Condominium Act:

§ 55-79.41. "Common elements" means all portions of the condominium other than the units.

§ 55-79.53. *Compliance with Condominium Instruments.* A. The declarant, every unit owner, and all those entitled to occupy a unit shall comply with all lawful provisions of this chapter and all provisions of the condominium instruments.

*Any lack of such compliance shall be grounds for an action or suit to recover sums due, for damages or injunctive relief, or for any other remedy available at law or in equity, maintainable by the unit owners' association, or by its executive organ or any managing agent on behalf of such association, or, in any proper case, by one or more aggrieved unit owners on their own behalf or as a class action.* A unit owners' association shall have standing to sue in its own name for any claims or actions related to the common elements as provided in subsection B of § 55-79.80. Except as provided in subsection B, the prevailing party shall be entitled to recover reasonable attorney fees, costs expended in the matter, and interest on the judgment as provided in § 8.01-382. This section shall not preclude an action against the unit owners' association and authorizes the recovery, by the prevailing party in any such action, of reasonable attorney fees, costs expended in the matter, and interest on the judgment as provided in § 8.01-382 in such actions.

§ 55-79.80. *Control of Common Elements.* B. Except to the extent prohibited by the condominium instruments, and subject to any restrictions and limitations specified therein, the executive organ of the unit owners' association, if any, and if not, then the unit owners' association itself, shall have the irrevocable power as attorney-in-fact on behalf of all the unit owners and their successors in title with respect to the common elements, including without limitation the right, in the name of the unit owners' association, (i) to grant easements through the common elements and accept easements benefiting the condominium or any portion thereof, (ii) to assert, through litigation or otherwise, defend against, compromise, adjust, and settle any claims or actions related to common elements, other than claims against or actions involving the declarant during any period of declarant control reserved pursuant to subsection A of § 55-79.74, and (iii) to apply for any governmental approvals under state and local law.

Both Code §§ 55-515(A) and 55-79.53 provide for a suit to recover damages by, *inter alia,* the owners' association or an owner "in a proper case." Both provide for the recovery of reasonable attorney fees, costs, and interest. Both use, in general, the same language.

Despite the fact that, pursuant to Code § 55-515(A), the association or its board of directors already had authority to enforce (but not necessarily exclusive standing to enforce) compliance with all provisions of the declaration, the General Assembly restated that authority in Code § 55-

513(E). Perhaps the provision was to amplify the authority to include enforcement of "duly adopted rules and regulations." Somewhat similarly, despite the fact that, pursuant to Code § 55-79.53, the association or its board of directors already had authority to enforce compliance with all provisions of the condominium instruments, the General Assembly added to that same paragraph language conferring on the unit owners' association "standing to sue in its own name for any claims or actions related to the common elements as provided in subsection B of § 55-79.80."

Note that Code § 55-513(E) is much more general in scope, and it does not specifically refer to the board's authority with respect to "common areas" (the parallel to "common elements"), and it does not refer to any provision in the VPOAA similar to "subsection B of § 55-79.80" (because there is not one). It is true that Code § 55-513(A) confers on the board of directors "the power to establish, adopt, and enforce rules and regulations with respect to use of the common areas and with respect to such other areas of responsibility assigned to the association by the declaration," but nothing in that language remotely indicates that the power is exclusive to the board.

The language that I have italicized in Code § 55-79.53 not only confers standing on the owners' association to act with respect to common elements, but it also refers to another section of the Code. One might wonder why the Condominium Act carves out an apparent special standing for the owners' association regarding common elements (unlike the VPOAA, which is silent on the matter) until one reads Code § 55-79.80. That section of the Condominium Act is one for which there is no parallel in the VPOAA. It vests in the owners' association the "irrevocable power as attorney-in-fact on behalf of all the unit owners . . . with respect to the common elements . . . to assert . . . any claims . . . related to common elements . . . ." A comparison of Code § 55-515(A) (even including Code § 55-513(E)) to Code § 55-79.53 (with its additional sentence and incorporation of Code § 55-79.80) yields the necessary conclusion that the General Assembly has authorized different things in the different Acts, despite some identical language. Although it clearly could have granted exclusive authority to the owners' association or the board of directors in the VPOAA, its failure to do so in that statute and its having done so in a parallel one leads to the conclusion that it did what it intended in both Acts. For this Court to read into the VPOAA language that is not there, merely because it is in the Condominium Act, is to "add [to the former] language which the legislature has chosen not to include." *County of Amherst Bd. of Supervisors v. Brockman,* 224 Va. 391, 397 (1982) (citations omitted).

The significance of the differences in the Condominium Act and the VPOAA is highlighted by the case of *Mozley v. Prestwould Bd. of Dirs.,* 264 Va. 549 (2002), a case cited in *Kuznicki.* In that case, an individual owner filed a declaratory judgment action to resist payment of an assessment to

pay for an expense to replace items that she maintained were not common elements within the meaning of the Condominium Act. Although the case actually involved the right of the owners' association to recover attorney's fees from Mozley on its cross-bill, in construing Code § 55-79.53, the Court held:

> The language of Code § 55-79.53(A) is expressed in plain and unambiguous terms. This subsection authorizes two types of litigation. The first type concerns actions for failure to comply with provisions contained in relevant condominium instruments or in the Act. Such actions for noncompliance may be brought by a unit owners' association, its executive organ or managing agent, or by "one or more aggrieved unit owners on their own behalf or as a class action." *Id.*; *see also Frantz v. CBI Fairmac Corp.*, 229 Va. 444, 450-51, 331 S.E.2d 390, 395 (1985). . . .
>
> The second type of litigation addressed by Code § 55-79.53(A) authorizes a unit owners' association of a condominium to bring suit in its own name for "any claims or actions related to the common elements" of a condominium, as set forth in Code § 55-79.80(B). Such suits are described by Code § 55-79.80(B) to include, among other things, the right to assert, through litigation or the defense against litigation, "any claims or actions related to common elements."

*Id.* at 555. However, given two types of litigation (and the second could be a sub-set of the first), it is not the language of the third sentence of Code § 55-79.53 that vests in the owners' association exclusive authority to act; that comes from Code § 55-79.80.

> The second type of litigation concerns actions related to common elements. *Id.* With regard to the second type of litigation, Code § 55-79.53(A) specifically states, *"A unit owners' association shall have standing to sue in its own name for any claims or actions related to the common elements as provided in subsection B of § 55-79.80."* (Emphasis added.) As already discussed, Code § 55-79.80(B) irrevocably gives a unit owners' association the right to "assert, through litigation or otherwise, defend against, compromise, adjust, and settle any claims or actions related to common elements."

*Kuznicki*, at 175 (citation omitted). In the VPOAA, assuming that the combined effect of Code § 55-513(E) and Code § 55-513(A) is to create an analog to the third sentence of Code § 55-79.53 (and they do not, quite), there is nothing on which to base an argument that the authority granted

 

to the board of directors is exclusive because there is no provision in the VPOAA that is similar to Code § 55-79.80.

With that backdrop, I note that, in *Kuznicki,* the dispositive issue was "whether the [Kuznickis] had standing to institute this suit seeking injunctive relief and damages against [the Masons] for their actions that allegedly decreased the size of the limited common element." *Id.* at 169. The Court's very clear holding was:

> We conclude that, under Code §§ 55-79.53(A) and -79.80(B), only a condominium unit owners' association has standing to sue for claims related to common elements and limited common elements.

*Id.* Two things are immediately apparent from the concise holding of the Court. First, the issue was decided on the basis of the Condominium Act (which is not applicable to the claim by Brooks against the Stallingses). Second, critical to the Court's determination was its reliance on Code § 55-79.53 (and its reference to the owners' association's standing regarding common elements) and Code § 55-79.80(B) of that Act (and its irrevocable attorney-in-fact), as to which (as I have noted) there are no corresponding provisions in the VPOAA.

The Kuznikis conceded that "a unit owners' association has broad powers with regard to common elements," *id.* at 172, but they argued that "a unit owner still has standing to maintain an action concerning an individual right not held in common by all unit owners," *id.* at 173. They argued that Code § 55-79.53(A) reserved to an aggrieved unit owner the right to bring an action in a "proper case." At that stage of the opinion, the Court observed that the Code had been amended in 1981 to add Code § 55-79.80(B), which provided that the:

> unit owners' association itself, shall have the irrevocable power as attorney-in-fact on behalf of all the unit owners and their successors in title with respect to the common elements, including without limitation the right, in the name of the unit owners' association . . . (ii) to assert, through litigation or otherwise, defend against, compromise, adjust, and settle any claims or actions related to common elements . . . .

*Id.* Although the Kuznickis conceded that the Code "divest[ed] an individual unit owner . . . of standing to bring an action with regard to rights held in common by all unit owners," they viewed their claim as a "proper case" because, they argued, their claim involved "an individual right not held in common by all unit owners." *Id.* at 173. Hence, they argued, it was not Code § 55-79.80 that applied; rather, it was Code § 55-79.53 that controlled.

The Court observed that their "argument assumes that the standing given to a condominium unit owners' association . . . to bring . . . actions related to common elements does not include actions concerning limited common elements." *Id.* at 174. The Court then debunked that assumption, affirming that a limited common element was a common element nonetheless, with the result that the owners' association had been given the power to act pursuant to an irrevocable attorney-in-fact relating to that common element. That should have ended the case because the concept of a "proper case" can arise only if Code § 55-79.53 applies; Code § 55-79.80 is absolute and unconditional, and if the case falls within its purview, by definition, it cannot be a proper case for an individual owner, whatever action the unit owners' association takes or fails to take.

Nevertheless, the Supreme Court had previously recognized that because of the exclusive standing of the owners' association, there could be no "proper case" that involved "'a right held in common by all unit owners . . . [and here it added the component that has created near chaos in my attempting to sort out its holding] unless the association fails or refuses to assert the common right.'" *Kuznicki* at 173 (citing *Frantz v. CBI Fairmac Corp.*, 229 Va. 444, 450-51 (1985)). The negative implication is that, if the owners' association does fail or refuse to pursue the action, it becomes a "proper case" for the individual owner. I suggest either that the Court was unclear as to which statute that last dependent clause applies, or it is conflating Code § 53-79.53 and Code § 53-79.80 if the premise is that it was applying the "proper case" authorization language to the latter.

As I have noted, although the Kuznickis argued that the issue before the Court did not involve a common right, the Court concluded that it did. However, apparently, the association either failed or declined to pursue the issue to the Kuznickis' satisfaction. That is a fair inference because the association retroactively approved the Masons' actions. Hence, if the Court concluded that the concept of a "proper case" applied to Code § 55-79.80, the observation must mean that the Court could not have reached the conclusion that the Kuznickis could not bring the case if it applied its own reasoning. If (a) the assertion of a "common right" lies exclusively with the owners' association pursuant to Code § 55-79.80, and (b) if the right at issue is a common right, and (c) if the owners' association fails or refuses to assert it, then (d) an individual owner can assert the right because it becomes a "proper case." That logical conclusion means that every matter involving a common right can be asserted by an individual owner if the owners' association refuses or fails to do so. That interpretation guts the concept of exclusive standing or authority in the owners' association because it necessarily expands standing to an individual owner simply because the owners' association does not act. Hence, the concept of a "proper case" cannot apply to Code § 55-79.80 if it was the intention of the General Assembly to leave the assertion of common rights solely in the hands of

the owners' association. To ensure that only the owners' association could act to the exclusion of the individual owners, not only would the assertion of the right need to be exclusively with the owners' association, but the decision whether or not to pursue it would have to be as well, and the failure to do so could not be the basis of a "proper case."

If the individual owner concluded that the owners' association made the wrong decision (*i.e.*, refused to pursue an action as to which the association had exclusive standing), the owner would have recourse through the final sentence of Code § 55-79.53(A) to pursue "an action against the unit owners' association." Lest there be any misunderstanding on that issue, however, such an action (to compel the owners' association to act) is not to be confused with a "proper case" in which the individual owner would seek directly to enforce the covenants. Those two actions are entirely different, with different parties, different theories, different remedies, and different results.

Moreover, the Court's reference to *Frantz* takes the language out of context because of the law in effect in 1985. In *Frantz*, there was no statute corresponding to Code § 55-79.80(B)(ii),[1] but Code § 55-79.53 (to which the concept of a "proper case" applies) was in effect. However, the owners' association did act in *Frantz*, so the association's action rendered it not a "proper case" for the individual owner even under Code § 55-79.53. In *Kuznicki*, the owners' association did not act, so, by the Court's own observation, pursuant to Code § 55-79.53, the Kuznickis should have had standing to act to assert the right if the "proper case" concept also applied to Code § 55-79.80.

All of this can make sense if the decisions in *Frantz* and *Kuznicki* are read in light of the statutes with which the respective Courts were working, and if one limits the Court's citation of *Frantz* regarding a "proper case" to an interpretation of Code § 55-79.53, the statute that the Court in *Frantz* was construing, and one of the two statutes in play in the *Kuznicki* case. The Court in *Frantz* used Code § 55-79.80 (as it was then worded) only to reinforce its observation that Code § 55-79.53 gave the owners' association exclusive standing to bring an action involving a common right, with the caveat that, if it failed to act, standing was not exclusive. (As I have noted, in *Frantz,* the owners' association did act, so the exception could not apply.)

---

[1] To be sure, there was language giving the owners' association an irrevocable power-in-fact to "grant easements through the common elements and accept easements benefiting the condominium or any portion thereof," Code § 55-79.80(i) (as it now appears), and that was a component in the Court's determination that the association had authority to act. At issue in *Frantz* was the authority of the owners' association to resolve a claim against the condominium developer relating to a parcel that was not "a common element of the condominium, as that term is used in the Condominium Act," but "once [the right was] established, would have been held in common by all the unit owners." *Id.* at 449.

The Court in *Kuznicki* correctly observed that it was Code § 55-79.53 that the Court in *Frantz* was construing when it came to its conclusion,[1] and it agreed with that conclusion. Hence, the Court's consideration of what is a "proper case" (in both cases) relates only to Code § 55-79.53, and its construction of that statute leaves open the possibility that vindication of a common right can be a "proper case" if the owners' association fails or refuses to act, unless there is some other limitation on the individual owner's right to act. In *Frantz*, the owners' association did act, and that was the end of the inquiry. In *Kuzincki*, the owners' association did not act, but there was another limitation on the individual owner's right to act. The Court held that the individual owners did not have standing to act because the owners' association had exclusive standing pursuant to Code § 55-79.80, a provision in the Condominium Act that has no parallel in the VPOAA.

Although it addressed (in what is clearly *dictum* in light of the holding) what a "proper case" is, the Court in *Kuznicki* then turned to Code § 55-79.80, which was dispositive of the issue. In that statute, what is a "proper case" under Code § 55-79.53 is irrelevant because Code § 55-79.80 decrees that the owners' association "shall have the irrevocable power as attorney-in-fact on behalf of all the unit owners . . . to assert, . . . defend against, compromise, adjust, and settle any claims or actions related to common elements." The issue of what is a "proper case" simply is not part of the equation. Under Code § 55-79.80, issues related to common elements are solely in the purview of the owners' association. Even if the issue of a "proper case" were relevant, it can be so only in the context of the Condominium Act, and the construction of the term under that act cannot survive careful scrutiny as it is used in the VPOAA because the VPOAA does not provide for exclusive standing for the owners' association with respect to common areas.

The assertion that similar language in the Acts is to be construed differently is supported by the fact that the Acts deal with entirely different legal constructs. There is a fundamental difference in the "common elements" properties subject to the Condominium Act, and the "common area" property subject to the DC and the AC (and, generally, to developments to which the VPOAA applies). As to the Condominium Act, by definition, "[n]o project shall be deemed a condominium . . . unless the undivided interests in the common elements are vested in the unit owners." In the case at bar, the "open space areas" (or "common areas") are owned by the owners' association. A right of enjoyment to wooded land adjacent to Brooks's private property, even though others have a similar right, is not to be equated to the joint ownership of a hallway, an elevator, or the roof covering a beehive of individual living units. To be sure, except as to "private

---

[1] Having cited Code § 55-79.53(A), the Court stated: "This subsection was the focus of the Court's decision in [*Frantz*]." *Kuznicki,* at 173.

open space areas," each of the owners has an easement of enjoyment in or to the "open space areas," but none has an interest in the fee.

The "common element" contemplated by the Condominium Act is a concept unknown to common law. Indeed, a condominium is a legal fiction created by statute and necessarily is governed by statute;[1] a non-exclusive easement is governed by common law, unless altered by contract or statute. In the case at bar, the contracts (the WD and the AC) do not significantly alter the rights of the owner of the dominant tract, and the VPOAA, unlike the Condominium Act, does not divest the easement holder from pursuing her rights.

That property right in an easement may be protected by the easement holder through common law for violations such as trespass, nuisance, conversion, etc. Brooks is acting within her individual property rights when she brings an action against anyone who violates those rights. For example, assume a random person from the public at large walks in the common area. That person would be trespassing because his actions interfere with Brooks's right to her easement. However, Brooks would not be able to bring an action in tort against Stallings or Miner if they were merely exercising the Stallingses' easement in the common area, because they would be there by right (Miner, derivatively), engaging in conduct that does not interfere with Brooks's right. However, if the Stallingses' or Miner's actions exceeded the right granted by an easement (*e.g.*, if they constructed a pool in the common area), that action would constitute an interference with Brooks's individual property right because the actions of Stallings or Miner exceeded the scope of their rights.

Next, despite the fact that Code § 55-515(A) authorizes the owners' association to file suit to enforce compliance with "this chapter and all provisions of the declaration," and although Code § 55-513(E) permits the board to file or defend in its own name with respect to violations of the declarations, neither requires that the association or the board do so. Moreover, Article VI, § 1, of the AD authorizes (but does not require) the owners' association to "maintain common properties" devoted to specific purposes, and § 3(a) of the same Article (in irreconcilably inconsistent language but in consecutive sentences) either (a) authorizes (but does not require) the owners' association to undertake maintenance responsibilities or (b) makes the owners' association "responsible for the management, maintenance and upkeep of all the Common Properties. . . ."

In *Frantz,* the Court not only concluded that the owners' association had the authority to act; it apparently concluded that it had the exclusive authority to act to resolve the issue of the disputed property. In *Kuznicki,* the Court concluded, not only that the owners' association had the authority to act; it concluded that it had the exclusive authority to enforce the covenants.

---

[1] All rights held in common by the unit owners in a condominium development are ones "stemming from the Condominium Act." *Frantz,* at 449.

In both cases, the Court viewed the issue of a "proper case" through the lens of the exclusive authority of the owners' association to act. Seen in that light, given that exclusive authority was vested in the association, neither case presented a situation which could be a "proper case" for action by an individual owner.

Finally, and of almost compelling significance, none of the VPOAA, the WD, or the AD contains language of the scope or focus of the language of the Condominium Act that appears in Code § 55-79.80. The owners' association of which Brooks is a member does not have an "irrevocable power as an attorney-in-fact" to take any action on behalf of the owners. To be sure, the owners' association has standing, has power, and has authority to enforce the covenants that Brooks seeks to enforce, but it clearly has no obligation to act, and the definition of a "proper case" must be considered in that light. The conclusion is, under the VPOAA, that authority or that standing is not exclusive to the owners' association; no matter which document or statute one examines, the individual·owner has standing to bring the action.

Moreover, given that the owners' association has discretion whether or not to act to enforce the covenant and could elect either to do so or not, it is possible that the only remedy that an owner would have is to bring the action individually. I understand that *Frantz* suggested the possibility that the owners could bring the action "if the association fails or refuses to assert the common right." *Frantz,* at 451. I understand, too, that one might argue that Brooks cannot act until the owners' association in this case has either failed or refused to act (although that then gives rise to the question of how long she must wait). However, were the Court to require that Brooks sue the association to insist that it act, the defense could be that it has no obligation to do so. Brooks would be left with the Quixotic task of pursuing the remedy of insisting that the owners' association act, knowing that its defense could be simply that one cannot be compelled to do what one is not obliged to do.

e. Disposition of the Stallings Demurrer as to standing.

1. In paragraphs 7 through 10 of the Stallings Demurrer, the Stallingses appear generally to assert that Brooks has no standing as a Member of the Association to pursue her claims "whether pursuant to the [WD] or the [AD]" or pursuant to Code § 55-515(A). I have addressed that broad demurrer as to standing in Section III.A.1. However, the Stallingses also take issue with specific Counts.

2. Count I: Brooks alleges that the Stallingses are liable to her, individually and as a member of the Association, because Miner (as the Stallingses' agent) was negligent (a) in failing to ascertain boundary, (b) in failing to investigate or comply with the obligations of the WD and the AD, and (c) to the extent that he had proper permission to do so, in failing

properly to trim the trees both on the Brooks Property and in the Open Space Area. In paragraph 11 of the Stallings Demurrer, the Stallingses assert that Brooks "is not entitled . . . to recover . . . damages as a member of the Association . . . based on either an alleged violation of the [WD] or alleged damage to the 'Open Space Area.'" That is because "neither the provisions of the [WD] or any other declaration create any right" for her to seek monetary damages . . . for harm to the 'Open Space Areas.'" In Section III.A.1.b., I have addressed that assertion.

3. Count II: Brooks alleges that the Stallingses are liable to her, individually and as a member of the Association, because the Stallingses were negligent (a) in failing to ascertain the boundary, (b) in failing to investigate or comply with the obligations of the WD and the AD, (c) in failing to properly instruct Miner not to cut trees in the Open Space Area or the Brooks Property, or (d) in failing properly to supervise Miner. In paragraph 11 of the Stallings Demurrer, the Stallingses make the same assertion as I have noted with respect to Count I, and, again, I note that, in Section III.A.1.b., I have addressed that assertion.

4. Count III: Brooks alleges that she "is . . . entitled to damages" (although she does not state in what capacity or capacities or from whom the damages are due) because Mr. Stallings violated the restrictive covenants of the WD by cutting trees in the Open Space Area "without written permission" and by cutting trees on the Brooks Property "without written permission." In paragraph 11 of the Stallings Demurrer, presumably Mr. Stallings makes the same assertion as I have noted with respect to Count I, and, again, I note that, in Section III.A.1.b., I have addressed that assertion.

5. Count IV: Brooks alleges that she "is entitled to damages" (although she does not state in what capacity or capacities or from whom the damages are due) because Mr. Stallings violated the restrictive covenants of the AD by cutting trees in the Open Space Area "without written permission." In paragraph 12 of the Stallings Demurrer, the Stallingses assert that the AD contain no "covenants or restrictions that either creates [sic] any explicit interest in the Open Space Area on behalf of the Association or of [Brooks] or that prevents, prohibits or requires [sic] written permission prior to tree-cutting activity in the Open Space Areas." In Section III.A.1.b., I have addressed the issue of Brooks's authority to pursue an action as a member of the Association.

6. Count VI: Brooks alleges that, "as a member of [the Association] [she] is . . . entitled to recover damages" against Miner and the Stallingses for trespass onto the Open Space Area. The Stallingses assert the same argument as they did with respect to Count IV, and I note, again, that, in Section III.A.1.b., I have addressed the issue of Brooks's authority to pursue an action as a member of the Association.

7. Count VII: Brooks alleges that the Stallingses and Miner, as agent for the Stallingses, are liable to her, individually and as a member of the

Association, for the wrongful conversion of trees on the Open Space Area and on the Brooks Property. In paragraph 13 of the Stallings Demurrer, the Stallingses assert that "for all the foregoing reasons," Brooks is not entitled to recover compensatory or punitive damages (in either capacity) for the conversion of "trees located in the Open Space Area." In Section III.A.1.b., I have addressed that assertion.

8. The Stallings Demurrer's "Kitchen Sink" Argument, referred to in Section II.A , not raised in the Stallings Demurrer, but appearing for the first time in their memorandum, is the issue of Brooks's "attempts to state tort claims arising from the limitations set forth in the [AD]." That is not a matter of which the Court will take cognizance because it is only with the greatest of effort that I can extract it from the Stallings Demurrer, and, "only grounds stated in the demurrer may serve as a basis for granting the demurrer." *Anthony v. Verizon Va., Inc.*, 288 Va. 20, 31 (2014).

Nevertheless, although I do not intend to spend much time addressing an issue not clearly raised by a demurrer, I do observe that, with respect to any argument that a claim may only be brought in contract or tort, I note that "it is well-established that a single act or occurrence can, in certain circumstances, support causes of action both for breach of contract and for breach of a duty arising in tort, thus permitting a plaintiff to recover both for the loss suffered as a result of the breach and traditional tort damages, including, where appropriate, punitive damages." *Abi-Najm v. Concord Condominium, L.L.C.*, 280 Va. 350, 361 (2010) (citations omitted). In addition, I reject the argument that an easement of enjoyment does not confer an enforcement right on the owner of that easement. In *Manchester Oaks Homeowners Ass'n v. Batt*, 284 Va. 409, 420-21 (2012), the Court, addressing the rights of an easement of enjoyment in common property (although in that case the property at issue was parking spaces), said that it was the prerogative of the holders of the easement to enforce that right, *i.e.*, to have someone towed for improperly parking.

I see no reason why an enforcement of the right of enjoyment should be limited in its enforcement against people who have no right at all and not be enforceable against those who have exceeded their right. For example, in *Manchester,* the Court held that a lot owner should be able to enforce his rights by having towed the vehicle of a random member of the public who illegally parked in the common property, and that lot owner should also be able to enforce his rights by making another lot owner remove a storage shed placed in a parking space that is common property. In the first instances, the trespasser had no right; in the second, the offender had a right but exceeded it, so he became a trespasser. In both instance, the intrusion was the same.

### f. Disposition of the Miner Demurrer as to standing.

In his brief, Miner addresses only Brooks's standing to pursue punitive damages as to Count VI (trespass), asserting that the AD "do not include any covenants or restrictions that either creates [sic] any explicit interest in the Open Space Area on behalf of the Association or [Brooks] or that prevents, prohibits or requires [sic] written permission prior to tree-cutting activity in the Open Space Areas." In Section III.A.1.b., I have addressed the issue of Brooks's authority to pursue an action as a member of the Association. With respect to the issue of written permission, rarely is the absence of written permission to enter another's property or to intrude on another's easement a prerequisite to an action for trespass.

### 2. *Punitive Damages (Considered Without Reference to the Standing Issue)*

The Stallings Demurrer states that Brooks "is not entitled to recover punitive damages as a matter of law for any of the various claims asserted," and, more particularly, that she "is not entitled to recover punitive damages pursuant to Counts V and VI because the [AD] fails as a matter of law to allege facts sufficient to state a claim for punitive damages." The Miner Demurrer echoes the second claim of the Stallings Demurrer, although in his memorandum, Miner adds that Brooks is "not entitled to recover punitive damages, as a member of the Association pursuant to Count VI."

The question then arises whether "there is misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard of the rights of others," *Giant of Virginia, Inc. v. Pigg*, 207 Va. 679, 685 (1967), which is requisite to the Court granting punitive damages. I note again that on a demurrer I do not test the strength of the proof but the legal sufficiency of the facts alleged in the pleadings. *Eagle Harbor, L.L.C. v. Isle of Wight County*, 271 Va. 603, 611 (2006). Brooks alleged that the Stallingses "intentionally, and with knowledge, directed Mr. Miner to make the unauthorized cutting and damage to the trees on the Brooks property . . . . [and Stallings and Miner] acted in willful disregard to the clearly marked boundaries . . . . [in willful disregard of the rights of Mrs. Brooks." (Amended Complaint at ¶¶ 69, 70, 72.) Brooks further alleged the same intentional and willful disregard with respect to the trees located in the Open Space Area. (Amended Complaint ¶¶ 78-82.) Taking these allegations as true at this stage, Brooks has sufficiently pleaded that Stallings and Miner acted in a manner so reckless and negligent as to evince a conscious disregard of the rights of others.

Rule 3:18 provides that an "allegation of negligence or contributory negligence is sufficient without specifying the particulars of the negligence." The Rule does not distinguish between ordinary and gross negligence, so the reasonable conclusion is that it applies to both. Generally consistent

with the Rule, the Supreme Court of Virginia has addressed the sufficiency of an allegation of gross negligence at the demurrer stage, *e.g.*, in *Koffman v. Garnett,* 265 Va. 12 (2003), in which the Court observed: "Whether certain actions constitute gross negligence is generally a factual matter for resolution by the jury and becomes a question of law only when reasonable people cannot differ . . . ." *Id.* at 15.

The gloss that the Court has imposed on the Rule is that the trial court must make an initial determination whether "reasonable persons could disagree on this issue." *Id.* at 16.

The Defendants misconstrue the duty of the Court at the demurrer stage. Although they have correctly cited applicable case law for a definition of gross negligence, the Defendants have not cited to the Court a case in which the appellate courts of the Commonwealth have addressed the issue whether a trial court should have sustained a demurrer to punitive damages; rather, they have cited the Court to cases addressing whether the evidence, fully developed by the plaintiff at trial, could support a jury verdict finding gross negligence. Although a motion to strike the evidence on an issue at the conclusion of the plaintiff's case is similar to a demurrer, the two pleadings are different.

At a motion to strike, the Court does not have to take allegations as true. Rather, it is "required to resolve any reasonable doubt as to the sufficiency of the evidence in favor of the plaintiff." *Costner v. Lackey,* 223 Va. 377, 381 (1982). At the close of plaintiff's case, a motion to strike could be granted because an element alleged in pleading was not addressed or proven, or because essential evidence subject to cross examination was determined to be inherently unreliable. These examples demonstrate a qualitative difference in the considerations the Court must make when considering a motion to strike but which are inappropriate in assessing a demurrer. The Stallingses' reference to *Green v. Ingram,* 269 Va. 281 (2005), illustrates the point. Although the Stallingses rely on the case to support the proposition that a plaintiff "must allege *facts* that establish that the Defendants' conduct was willful and wanton" (emphasis added by the Stallingses), that is not the proposition for which the case stands. In that case, the Court observed that the "plaintiff has alleged willful and wanton conduct in support of a claim for punitive damages." *Id.* at 292. The problem for the plaintiff in that case was that he did not prove facts to support punitive damages.

Looking back to Rule 3:18, the instruction I take from it is that the better course is to permit the jury to hear the evidence, perhaps revisit it on a motion to strike, or perhaps let it go to the jury for resolution and subsequent reexamination, depending on the jury's verdict. That is consistent with the general policy in the judiciary of the Commonwealth to permit litigants their day in court if there is a colorable claim to pursue. *See Seyfarth, Shaw, Fairweather & Geraldson v. Lake Fairfax Seven, Ltd. P'ship,* 253 Va. 93, 95 (1997); *Hunter v. Burroughs,* 123 Va. 113, 129 (1918).

Accordingly, based on the foregoing, I overrule both the Stallings Demurrer and the Miner Demurrer on all grounds.