COURT OF APPEALS OF VIRGINIA

Present:   Judges O'Brien, Fulton and Callins
Argued at Richmond, Virginia


DENNIS CHRISTOPHER HOWARD

OPINION BY

v.          Record No. 1499-22-2          JUDGE DOMINIQUE A. CALLINS
MARCH 5, 2024

SHERIFF ROGER L. HARRIS, ET AL.


FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
Marcus D. Williams, Judge Designate

Ashley T. Davis (Christopher J. Toepp; Allen Allen Allen & Allen,
P.C., on briefs), for appellant.

John P. O'Herron (William D. Prince IV; John P. O'Malley;
*Thompson*McMullan, P.C., on brief), for appellees.

Amicus Curiae: Virginia Trial Lawyers Association (Lee A. Floyd;
Breit Biniazan, P.C., on brief), for appellant.

Amicus Curiae: Commonwealth of Virginia; Graham K. Bryant,
Deputy Solicitor General (Jason S. Miyares, Attorney General;
Andrew N. Ferguson, Solicitor General; Erika L. Maley, Principal
Deputy Solicitor General, on brief), for appellees.

Amicus Curiae: Local Government Attorneys of Virginia, Inc.
(Annie Kim; Jim Guynn; Guynn, Waddell, Carroll and Lockaby,
P.C., on brief), for appellees.


While detained in the backseat of a law enforcement vehicle, Dennis Christopher Howard

jumped his handcuffs, obtained a loaded handgun from the front seat of this vehicle, and shot

himself in the head. Surviving this suicide attempt, Howard sued Spotsylvania County Sheriff

Roger L. Harris and Deputy David Setlock, alleging that they were grossly negligent in

supervising Howard during his detainment. The trial court granted summary judgment for the

defendants on two grounds: (1) by attempting suicide, Howard was a felon illegally in possession

of a firearm, barring any recovery under Virginia's illegality defense; and (2) under *Elliott v. Carter*, 292 Va. 618 (2016), Howard's gross-negligence claim failed as a matter of law because Deputy Setlock exercised "some degree of care" for Howard's safety in the events surrounding Howard's suicide attempt. On appeal, Howard challenges these two rulings. For the following reasons, we reverse the trial court's judgment.

BACKGROUND

On the day before attempting suicide, Howard got into a heated argument with his girlfriend, who obtained an emergency protective order against him and swore out a warrant for his arrest. Howard subsequently stated that he would "take down" any law-enforcement officers who tried to arrest him. At the time, Howard had been daily abusing alcohol and illegal drugs for several weeks.

The next day, on August 16, 2018, Howard took a shotgun belonging to his friend Linwood Chavis and left a suicide note, stating: "PLEASE GIVE TO STEPH—Tell everyone I love them and I[']m sorry. See ya in the next life bro." Howard took the shotgun and several shotgun shells into the woods near his home, where he wandered for around an hour. Meanwhile, Chavis discovered the suicide note and called the Spotsylvania County Sheriff's Office to report that Howard had taken the shotgun and might be suicidal. Deputy Setlock and multiple other officers arrived at Howard's home and searched the home and the surrounding wooded area. Deputy Setlock's body camera was turned on and recorded all of his actions during the events that unfolded that day. Officers ultimately apprehended Howard behind an abandoned warehouse near his home.

After Deputy Setlock arrived at Howard's location, he handcuffed Howard with two sets of handcuffs behind Howard's back, noting that Howard was a "big guy." Deputy Setlock searched Howard and removed various personal belongings, a large knife, and several shotgun

shells from Howard's pockets. Deputy Setlock placed the items on the ground. Deputy Setlock asked Howard whether he had a shotgun, to which Howard responded, "No, I don't have a shotgun . . . . There's no gun. There's no gun. If I had a gun, I'd have used it, seriously."

After the search, Deputy Setlock placed Howard in the back seat of his police vehicle with Howard's hands cuffed behind his back. At the time of Howard's detainment, a loaded handgun that Deputy Setlock had seized during a traffic stop the day prior was stored in plain view in a bag on the front passenger seat, and the window partition separating the front and back seats was open and unlocked. Deputy Setlock later explained that the handgun was still in his vehicle because the police evidence system was offline when he attempted to log the handgun into evidence the previous night. Deputy Setlock had also declined to store the handgun in a temporary storage locker because the lockers were often unavailable.

After securing Howard in the backseat of the police vehicle, Deputy Setlock walked away from the vehicle for the first time to search for the missing shotgun in the surrounding area. After searching for the shotgun for around two minutes, Deputy Setlock returned to the vehicle. Howard complained that he had trouble breathing, and in response, Deputy Setlock opened a window. Deputy Setlock then walked away from the vehicle for a second time to retrieve the items obtained from Howard's person from the ground.

At some point during the times that Deputy Setlock had walked away from his vehicle, Howard "jumped" his handcuffs by bringing his hands underneath his legs to the front of his body. He then reached through the open window partition separating the front and back seats of the vehicle, took the handgun from the bag in the front passenger seat, and confirmed that the handgun was loaded with a round in the chamber. Howard then moved his hands back underneath his legs and concealed the handgun beneath his legs.

After retrieving Howard's belongings from the ground, Deputy Setlock returned to his vehicle, opened the rear left passenger door, and observed that Howard's hands were underneath his knees. Deputy Setlock warned Howard that he would pepper spray him if he tried to jump his handcuffs, but otherwise took no actions to resecure Howard's handcuffs or ensure that Howard was still safely detained. Howard, who at this point appeared in visible distress and was rocking back and forth, again stated that he could not breathe and assured Deputy Setlock that he was not trying to escape. Howard then asked Deputy Setlock to turn up the air conditioning. Deputy Setlock confirmed that the air conditioning was at its highest setting and then placed Howard's knife on the front driver's seat.

Deputy Setlock then asked Howard about the missing shotgun and threatened to charge Howard with larceny if Howard did not reveal the shotgun's location. Howard responded, "Man, I just don't want to do this no more," and then revealed the shotgun's location behind a nearby building. Deputy Setlock then walked away from the vehicle for a third time to retrieve the shotgun with the help of a fellow officer and the officer's canine, who were already closing in on the shotgun's location at that time. After retrieving the shotgun, Deputy Setlock returned to his vehicle and placed the shotgun on the front seat and the shotgun shells into the cupholder. At this point, Deputy Setlock's police body camera footage shows Howard leaning his face through the open window partition. Deputy Setlock then walked away from the vehicle for a fourth time to converse with his fellow officer about whether to take Howard to jail or to a hospital. After attempting to contact his superior officer, Deputy Setlock returned to his vehicle and drove back to Howard's home with Howard still detained in the backseat.

After arriving at Howard's home, Deputy Setlock walked away from his vehicle for the fifth and final time to converse with his superior officer for a few minutes about whether to charge Howard with multiple felonies and take him to jail or take him to a hospital for a mental

evaluation, in light of Howard's threats of suicide. Meanwhile, Howard called Chavis from the backseat of Deputy Setlock's vehicle and told Chavis, "[T]ell my mother that I'm sorry." As Deputy Setlock started walking back to his vehicle to take Howard for a mental evaluation, the officers heard a single gunshot go off. The officers then rushed to the vehicle, opened the passenger door, and discovered that Howard had shot himself in the head with the handgun. The officers then summoned an ambulance and ensured that Howard was upright and could breathe while emergency medical personnel arrived. Howard was eventually moved to an ambulance to receive medical treatment. He ultimately survived the suicide attempt. Deputy Setlock was later suspended for two weeks for violating general orders pertaining to the transportation of custodial detainees and procedures for storing evidence.

Howard subsequently sued Spotsylvania County Sheriff Roger L. Harris and Deputy Setlock (collectively, "Harris"), alleging that they were grossly negligent in their supervision of Howard by allowing him to obtain and shoot himself with a handgun while detained in Deputy Setlock's police vehicle. In his amended complaint, Howard alleged that he was of unsound mind throughout the time of his apprehension and detention. Howard also alleged that, as a result of his suicide attempt, he suffered permanent and catastrophic injuries, including a severe traumatic brain injury.

After extensive discovery, the trial court granted summary judgment for Harris on two grounds: (1) in attempting suicide by use of a handgun, Howard was a felon illegally in possession of a firearm, barring any recovery under Virginia's illegality defense; and (2) under *Elliott v. Carter*, 292 Va. 618 (2016), Howard's gross-negligence claim failed as a matter of law because Deputy Setlock exercised "some degree of care" for Howard's safety in the events surrounding Howard's suicide attempt. The trial court declined to grant summary judgment for Harris on the grounds that the illegality defense also applied to Howard's suicide attempt as a

- 5 -

common-law crime, finding that there was a genuine factual dispute as to whether Howard was of unsound mind at the time of his suicide attempt. In so ruling, the trial court relied on the principle from *Wackwitz v. Roy*, 244 Va. 60 (1992), that "[t]o constitute suicide at common law the person must be of years of discretion and of sound mind." *Id.* at 65 (quoting *Plunkett v. Supreme Conclave, Improved Order of Heptasophs*, 105 Va. 643, 646 (1906)). The trial court later denied Howard's motion to reconsider. This appeal followed.

ANALYSIS

On appeal, Howard challenges the trial court's grant of summary judgment for Harris on the illegality defense and the gross-negligence claim. "[S]ummary judgment '[may] not be entered' unless no 'material fact is genuinely in dispute' on a controlling issue or issues and the moving party is entitled to such judgment as a matter of law." *Mount Aldie, LLC v. Land Trust of Va., Inc.*, 293 Va. 190, 196 (2017) (quoting Rule 3:20). "[I]n an appeal of a decision awarding summary judgment, the trial court's determination that no genuinely disputed material facts exist and its application of law to the facts present issues of law subject to de novo review." *Id.* at 196-97. "A factual issue is genuinely in dispute when reasonable factfinders could 'draw different conclusions from the evidence,' not only from the facts asserted but also from the reasonable inferences arising from those facts." *AlBritton v. Commonwealth*, 299 Va. 392, 403 (2021) (citation omitted) (quoting *Fultz v. Delhaize Am., Inc.*, 278 Va. 84, 88 (2009)). "[W]e review the record applying the same standard a trial court must adopt in reviewing a motion for summary judgment, accepting as true those inferences from the facts that are most favorable to the nonmoving party, unless the inferences are forced, strained, or contrary to reason." *Fultz*, 278 Va. at 88.

## I. Illegality Defense

In Virginia, "[t]he illegality defense is based on the principle that a party who consents to and participates in an illegal act may not recover from other participants for the consequences of that act." *Lee v. Nationwide Mut. Ins. Co.*, 255 Va. 279, 282 (1998). "The principal reason for the rule is that courts will not lend their assistance to one who participates in an illegal act and who seeks to profit therefrom." *Wackwitz*, 244 Va. at 64. "The rule applies to both tort and contract actions, and when applied to tort actions, 'consent or participation in an immoral or unlawful act by plaintiff precludes recovery for injuries sustained as a result of that act.'" *Id.* (quoting *Miller v. Bennett*, 190 Va. 162, 165 (1949)). "As with other defenses, the party raising the defense has the burden to establish it." *Lee*, 255 Va. at 283. "However, whether the defense will be applied requires more than a simple showing that the plaintiff committed the illegal act." *Id.* "[T]he defendant must also prove that the plaintiff consented to the commission of the illegal act and engaged in it, freely and voluntarily, without duress or coercion. This evidentiary burden necessarily includes consideration of the maturity, intelligence, and mental capacity of the plaintiff, regardless of age." *Id.*

Code § 18.2-308.2(A) states that "[i]t shall be unlawful for . . . any person who has been convicted of a felony . . . to knowingly and intentionally possess or transport any firearm or ammunition for a firearm." "[T]he pertinent conduct proscribed by Code § 18.2-308.2 is . . . that of 'being a felon' and 'knowingly and intentionally' being in possession of a firearm." *Branch v. Commonwealth*, 42 Va. App. 665, 669 (2004). Thus, "to prove a violation under the plain language of the statute, the [plaintiff] must establish nothing more than that the defendant 'has been convicted of a felony' and that he or she 'knowingly and intentionally possess[ed] . . . any firearm.'" *Id.* (third alteration in original) (quoting Code § 18.2-308.2(A)).

Here, Harris argues that there is no genuine dispute that Howard, in attempting suicide, violated Code § 18.2-308.2 because Howard stated in his own pleadings that "[a]t all times relevant to this Complaint it was unlawful for Mr. Howard to own or possess both a firearm and ammunition." Howard also admitted during discovery that he "had been convicted of a felony crime" prior to his suicide attempt, and he also stated in a motion that "[t]here is no dispute that Mr. Howard intentionally shot himself in the head in an effort to end his own life." Harris further contends that the evidence undisputedly showed that Howard did not suffer from an unsound mind because Howard's actions before attempting suicide showed that he could engage in forethought and planning and could understand the nature and consequences of his actions.

Howard argues that a genuine dispute existed as to whether he was of unsound mind at the time that he possessed the handgun because the evidence showed that he was suicidal and experiencing a mental health crisis. Howard stresses that he pled that he was suffering from an unsound mind at the time of his apprehension and detainment, and he contends that a finding that he was of unsound mind would preclude Harris from availing himself of the illegality defense under Code § 18.2-308.2. Howard also notes that the trial court, in denying summary judgment on the illegality defense vis-à-vis the common-law crime of attempted suicide, found that there was a genuine factual dispute as to whether Howard was of unsound mind at the time of his suicide attempt.

Until recently, Virginia adhered strictly to the common-law rule that "[f]or the purposes of determining criminal responsibility[,] a perpetrator is either legally insane or sane"— rejecting "subtle gradations of mental illness" or a "sliding scale of insanity." *Stamper v. Commonwealth*, 228 Va. 707, 717 (1985). However, in 2021, the General Assembly enacted Code § 19.2-271.6, permitting a criminal defendant to present evidence of his or her mental condition "to show the defendant did not have the intent required for the offense charged." Code § 19.2-271.6(B). As

- 8 -

this Court recently held, "Code § 19.2-271.6 is an evidentiary rule that abrogates the common law" and "allows evidence 'of the defendant's mental condition at the time of the alleged offense'—even if it falls short of insanity—if it 'tends to show the defendant did not have the intent required for the offense charged' and is otherwise admissible under the rules of evidence." *Calokoh v. Commonwealth*, 76 Va. App. 717, 731-32 (2023) (quoting Code § 19.2-271.6(B)). Additionally, in *Shaw v. Commonwealth*, ___ Va. App. ___ (Jan. 23, 2024), we clarified that mental-condition evidence under Code § 19.2-271.6 "must go further than showing merely that the defendant suffered impaired judgment or diminished capacity. The testimony must explain how the defendant did not have the state-of-mind [i.e., mens rea] required to commit the offense." *Id.* at ___.

Under Virginia law, "[t]here is . . . a presumption in favor of the sanity of every man until evidence that he is of unsound mind is introduced; and this presumption applies in all cases, criminal as well as civil." *Nelms v. Nelms*, 236 Va. 281, 287 (1988) (quoting *Wallen v. Wallen*, 107 Va. 131, 150 (1907)). Here, Howard alleged in his complaint that he was of unsound mind at the time of his detainment. This allegation raises a genuine dispute of a material factual issue. Pinpointing a precise definition of the term "unsound mind" proves elusive; it is an amorphous concept that lacks a concrete definition in Virginia law. In this case, both parties proposed jury instructions suggesting that a person of unsound mind would be unable to act knowingly and intentionally.[1] To the extent that Howard is capable of presenting evidence showing him being of unsound mind prevented him from having the requisite mens rea to have violated Code

---

[1] Howard defined "unsound mind" as follows: "An unsound mind is one that is not under the control of reason. Reason is the ability to think and to exercise judgment and to understand the nature, character and consequences of one's acts." Harris defined "unsound mind" as a mind that is (1) "so impaired by mental disease or disorder that [one is] unable to resist the impulse to engage in the behavior that led to his death"; or (2) "so impaired by mental disease or disorder that [one is] unable to distinguish right from wrong"; or (3) "so impaired by mental disease or disorder that [one does] not understand the nature, character and consequences of [one's] acts."

§ 18.2-308.2(A), such evidence is admissible under Code § 19.2-271.6 to prove that he did not knowingly and intentionally possess the handgun before attempting suicide. Therefore, we hold that the trial court erred in granting summary judgment for Harris on the illegality defense.

## II. Gross Negligence

"[U]nder Virginia law, a government agent . . . is immune from suit for simple negligence but not for gross negligence." *Green v. Ingram*, 269 Va. 281, 290 (2005). "Gross negligence is 'a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person.'" *Elliott v. Carter*, 292 Va. 618, 622 (2016) (quoting *Cowan v. Hospice Support Care, Inc.*, 268 Va. 482, 487 (2004)). Gross negligence "is a heedless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight diligence, or the want of even scant care." *Id.* (quoting *Chapman v. City of Va. Beach*, 252 Va. 186, 190 (1996)). "Gross negligence 'requires a degree of negligence that would shock fair-minded persons, although demonstrating something less than willful recklessness.'" *Id.* (quoting *Cowan*, 268 Va. at 487). "Several acts of negligence which separately may not amount to gross negligence, when combined may have a cumulative effect showing a form of reckless or total disregard for another's safety." *Id.* (quoting *Chapman*, 252 Va. at 190). "Deliberate conduct is important evidence on the question of gross negligence." *Id.* (quoting *Chapman*, 252 Va. at 190). "Ordinarily, the question whether gross negligence has been established is a matter of fact to be decided by a jury." *Id.* (quoting *Frazier v. City of Norfolk*, 234 Va. 388, 393 (1987)).

In *Elliott v. Carter*, the Supreme Court held that a Boy Scout troop leader (Carter) was, as a matter of law, not grossly negligent for the drowning death of a Boy Scout troop member (Caleb) during a Scout camping trip because Carter "exercised some degree of care" for Caleb's safety in the events surrounding Caleb's death. 292 Va. at 623. Carter had led Caleb, who could

not swim, to a partially submerged river sandbar, and Caleb drowned while trying to return to shore after Carter had already swum back to shore. *Id.* at 620-21. In holding that Carter was not grossly negligent in his supervision of Caleb, the Court pointed to several facts showing that Carter exercised "some degree of care" for Caleb's safety:

> First, it is not alleged that Caleb had any difficulty walking out along the sandbar with Carter. Second, there is no allegation that Carter was aware of any hidden danger posed by the sandbar, the river or its current. Third, Carter instructed Caleb to walk back to shore along the same route he had taken out into the river, and there was no evidence that conditions changed such that doing so would have been different or more dangerous than initially walking out, which was done without difficulty. Finally, Carter tried to swim back and assist Caleb once Caleb slipped off the sandbar, which is indicative that Carter was close enough to attempt to render assistance when Caleb fell into the water, and that Carter did attempt to render such assistance.

*Id.* at 623. Based on these facts, the Court found that "although Carter's efforts may have been inadequate or ineffectual, they were not so insufficient as to constitute the indifference and utter disregard of prudence that would amount to a complete neglect for Caleb's safety, which is required to establish gross negligence." *Id.* The Court further stated that "[b]ecause 'the standard for gross negligence [in Virginia] is one of indifference, not inadequacy,' a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Id.* at 622 (second alteration in original) (quoting *Kuykendall v. Young Life*, 261 Fed. App'x 480, 491 (4th Cir. 2008)). The Court concluded that "no reasonable jurist could find that Carter did nothing at all for Caleb's care," and thus "there was no question for the jury" on whether Carter was grossly negligent. *Id.* at 623.

Conversely, in *Green v. Ingram*, the Supreme Court held that a triable jury question existed as to whether a police officer (Ingram) was grossly negligent in causing Green's death, where Green was killed by fragments from frangible rounds shot by Ingram through Green's door while attempting to enter Green's home under a search warrant. 269 Va. at 291. The Court

- 11 -

held that a reasonable jury could find that Ingram was grossly negligent in firing the frangible rounds because (1) evidence from the manufacturer of the frangible rounds established that the rounds were only intended to be fired at the metal locking mechanism attached to a door; (2) Ingram departed from his instruction and training by firing four shots into the wooden part of Green's door beneath the metal locking mechanism; and (3) Ingram fired the four shots into the wooden part of Green's door despite knowing that other people might be in the room on the other side of the door. *Id.* The Court concluded that "[v]iewed in the light most favorable to the plaintiff and drawing all fair inferences from these facts, the [plaintiff] presented sufficient evidence to constitute a jury question on the issue of gross negligence." *Id.*

Here, Harris argues that, under *Elliott*, Howard's gross-negligence claim fails as a matter of law because Deputy Setlock exercised "some degree of care" for Howard's safety in the events surrounding Howard's suicide attempt. Harris also asserts that, although Deputy Setlock had a duty as a police officer to supervise Howard during his detainment, Deputy Setlock had an equally important duty to protect the public by finding the missing shotgun, which necessitated him leaving Howard momentarily unsupervised to carry out that duty. Harris further contends that Deputy Setlock could not have been aware that Howard's safety had been compromised at any point because Howard was compliant throughout his detainment and had effectively concealed the handgun from Deputy Setlock.

Howard argues that the trial court erred in determining that Deputy Setlock exercised "some degree of care" for Howard's safety because the trial court did not view the facts in the light most favorable to Howard and based its ruling on facts that were not relevant to whether Deputy Setlock exercised care towards Howard's safety. Howard also asserts that the "some degree of care" standard from *Elliott* did not supplant the broader principles in Virginia's gross-negligence law as applied by the Supreme Court in *Green* and that *Elliott* does not stand

- 12 -

for the proposition that a plaintiff's gross-negligence claim must fail so long as the defendant identifies any acts of care at all, no matter how remote or irrelevant those acts were in relation to ensuring the victim's safety.

We agree with Howard. Deputy Setlock may have initially exercised "some degree of care" for Howard's safety by handcuffing Howard, placing him in the backseat of the police vehicle, and helping ensure Howard's comfort while detained. But the threat that Howard posed to himself and to others changed significantly once Deputy Setlock was on notice that Howard's handcuffs were not effectively restraining him and that Howard appeared capable of jumping his handcuffs. To satisfy the "some degree of care" standard at this point, a factfinder could reasonably conclude that Deputy Setlock had to take some action to reasonably respond to the heightened level of threat that Howard posed and that this obligation superseded any competing duty that Deputy Setlock might have had to find the missing shotgun.

Viewed in the light most favorable to Howard, the evidence showed that Deputy Setlock took no actions to respond to this heightened threat, such as by resecuring Howard's handcuffs or ensuring that Howard was still safely detained in the police vehicle. Combined with Deputy Setlock's knowledge that (1) Howard was a suicidal detainee, (2) a loaded handgun was in plain view in a bag on the front passenger seat, and (3) the window partition separating the front and back seats was open and unlocked, a reasonable jury could find that Deputy Setlock's inaction constituted "a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Elliott*, 292 Va. at 622 (quoting *Cowan*, 268 Va. at 487). Therefore, we hold that the trial court erred in granting summary judgment for Harris on the gross-negligence claim.

## CONCLUSION

For the foregoing reasons, the trial court's judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*